Argued April 6, affirmed May 26, 1965

# STATE OF OREGON *v.* UNSWORTH
402 P. 2d 507

*Richard J. Smith,* Klamath Falls, argued the cause and filed a brief for appellant.

*Sam A. McKeen,* District Attorney, Klamath Falls, argued the cause for respondent. With him on the brief were J. R. Thomas and Harry D. Lewis, Deputy District Attorneys, Klamath Falls.

Before McALLISTER, Chief Justice, and PERRY, SLOAN, O'CONNELL, GOODWIN, DENECKE, and HOLMAN Justices.

McALLISTER, C. J.

The defendant, William Unsworth, was convicted of murder in the second degree, and sentenced to imprisonment in the penitentiary for life. He appealed and this court reversed the conviction and remanded the case for a new trial because of error in the admission of certain hearsay evidence. *State v. Unsworth,* 235 Or 234, 384 P2d 207 (1963). While the case was pending retrial it was resubmitted to the

grand jury, which returned a new indictment, again charging defendant with murder in the second degree. The defendant was tried on the new indictment, convicted, and again sentenced to imprisonment in the penitentiary for life. He again appeals.

The only serious questions presented in appellant's brief involve the admission in evidence of testimony concerning incriminating oral statements made by defendant at about the time of his arrest and of a written statement made by defendant as a result of his interrogation by the authorities while he was in custody in Klamath Falls.

As a witness on his own behalf, defendant testified that on or about April 15, 1962, in the living room of his home in Beatty he shot and killed one Anthony Moore. Beatty is a village on the highway traversing the Klamath Indian Reservation.

Defendant contended that the shooting was accidental and testified that it occurred in the following manner. Defendant lived with his wife, Helen, in a small house in Beatty; and for some years he had known Tony Moore, who was also living in Beatty. Defendant and Moore had worked together all day on Sunday, April 15, 1962, at cleaning up a yard for the owner of the tavern in Beatty. According to the defendant the two men quit work about five o'clock in the afternoon, defendant went to the tavern, drew $5.00 from his employer, drank a glass of beer, bought a couple of cans of beer and went home. Defendant had invited Moore to come to his house for supper. Moore was late and defendant went to the neighbors looking for Moore. Defendant did not find Moore but on the way back was accosted by "an Indian fellow" who told defendant they didn't want white people in Beatty and that he was going to run defendant out of town. Ac-

cording to defendant the Indian said that "he was going to go get his gun and come back and shoot at me. I told him to go ahead and get his gun and he took off to the east from the corner and I went on home."

Later in the evening Tony Moore arrived at defendant's home and brought with him a half gallon of wine. Defendant opened the jug and poured drinks for himself, his wife, and for Tony. At about that time defendant heard someone talking outside his house and his dogs, which were in the house, started to "make an uproar." Defendant picked up his gun, a 30-30 Winchester rifle, and after letting his dogs out, stepped outside and walked around the house. Defendant found no one and returned to the house. He testified:

> "* * * Of course, it was dark and I couldn't see anybody so I came on around the rest of the house and I stepped up on the porch * * * so I walked in the house with this gun cocked—I will absolutely not play around with a cocked gun and so I went to uncock the gun so I took the gun in my hand just like that and, of course, this was cocked then and I turned around and I opened the door and I stepped in and closed the door and just at the minute that I stepped in there I called my dogs in and then I closed the door. As I turned around, my wife just screamed at the top of her lungs, 'Bill, put that goddamn gun down', so I started into the kitchen and I had the hammer held back like this and I pulled the trigger to let the gun—to let the hammer down and my wife yelled at me and the hammer slipped and the gun went off."

The bullet struck Moore in the abdomen and killed him.

The shooting occurred about midnight on Sunday, April 15, 1962. After the shooting the defendant remained in the cabin and sent his wife to summon help

and notify the authorities. According to defendant he drank a considerable quantity of wine while he was waiting, and finally lay down on the bed. He testified that he remembered nothing from the time he lay down until he "woke up" in the district attorney's office in Klamath Falls later in the day.

A deputy sheriff named Conroy, who went to defendant's cabin to investigate the shooting, testified that while they were getting the defendant ready to take him to Klamath Falls, the following occurred:

"Q. What happened then?

"A. Well, he finally got the shirt on and part of it buttoned up and under his belt and then he grabbed for his pipe and tobacco and started to fill this pipe. He was having a pretty rough time and I offered to assist him and he told me, 'to get your goddamned hands away' that he could take care of himself.

"Q. Do you remember the exact words that he used at the time?

"A. 'Get your goddamned hands away from me, I'll wait on myself.'

"Q. What happened then?

"A. He staggered around and finally got the pipe filled and looked at me and he said, 'I've got a gun and I'll shoot your guts out, you son of a bitch'.

"Q. Then what happened—where was he when he said that?

"A. Standing by the bed.

"Q. Then, did he say anything else after that?

"A. Well, he raved on quite a little bit and turned around and observed Tony Moore sitting in the chair and he said, 'There is Tony' he says—he says 'He got in my way and I had to kill him'. He said to me again, 'If I had my gun, I'd kill you too, you son of a bitch', that's the words he said."

Another deputy sheriff as a witness repeated in substance the statements related by Conroy, and also testified as follows:

"Q. Was there any other conversation in your presence that you heard?

"A. Yes, Mrs. Unsworth came in and told Mr. Unsworth to shut up and he called her several names.

"Q. Mr. Hutton, we are going to have to know if you can recall the exact words that he said?

"A. He called her a 'dirty son of a bitch and a slut,' and he says, 'You're the one that I intended to kill anyway', and he tried to get away from us to get at her.

"Q. Was there any other conversation in your presence?

"A. I heard him tell Mr. Walker two or three times that he shouldn't—he didn't intend to kill Tony and that he was his best friend.

"Q. Anything else?

"A. That's all the conversation.

"Q. You testified a little while ago that you saw some kind of an argument between Mr. Unsworth and Mr. Conroy, did you hear the conversation if any, or any of the argument?

"A. I heard him say that if he could get a gun that he would shoot Mr. Conroy—that he would shoot him, that 'If I could get a gun I would kill you.'

"Q. Now, as far as you can recall right now, was that all of the conversation that you had?

"A. As far as I can recall, yes."

■ No objection was made in the trial court to the evidence concerning the incriminating statements made by defendant as related by the deputy sherrifs. However, this case was tried prior to the decision in *Escobedo v. Illinois,* 378 US 478, 84 S Ct 1758, 12 L Ed2d

977 (1964), and is here on direct appeal. We have held in *State v. Clifton*, 240 Or 378, 401 P2d 697, that under these circumstances the failure to object to the testimony in the trial court "did not constitute a waiver of defendant's constitutional rights."

■ We will consider first the testimony concerning the incriminating statements made by defendant in his home while the officers were investigating the shooting and preparing to take him to the county jail. There is no evidence that the defendant was informed of his right to remain silent or of his right to counsel before he made these incriminating statements. *State v. Neely*, 239 Or 487, 395 P2d 557 (1964), 398 P2d 482 (1965); *Escobedo v. Illinois,* supra. We think, however, that the statements were admissible. There is no evidence that these statements were made in response to any questioning. As far as this record shows the statements were made voluntarily by the defendant without any stimulus by the officers. There is no evidence of any police interrogation. Under the circumstances it seems clear that *Neely* and *Escobedo* are not applicable to the statements volunteered by defendant at his cabin.

During the late afternoon of Monday, April 16, while defendant was in custody in Klamath Falls, he was interrogated by an assistant district attorney and signed a statement in the form of a transcript of the interrogation. This statement was identified by witnesses for the state and admitted in evidence. In the statement defendant described the shooting in these words:

"* * * It was not intentional, it was accidental. I went to the door and I had been threatened a couple times and I didn't know how many people

were there. I had the gun in my hand and I cocked it and then when I saw that there wasn't anybody there and I was holding the hammer with my hand and I turned it back on safety or to safety. I turned around and my wife yelled at me and said, 'put that damn thing down.' When she hollared [sic] I was turned around towards Tony back into the kitchen. I had already pulled the trigger and when she screamed at me I just let go of the trigger, or I mean the hammer."

We find no material difference between defendant's account of the shooting as contained in his statement and his account of the shooting as recited from the witness stand. The two versions differ in some detail, such as the time when Moore came to defendant's home and when the men started to consume the wine brought by Moore. In both versions defendant contended that the shooting was accidental and we think the differences in detail are unimportant.

■ Defendant was represented by counsel, and when he took the witness stand and repeated in substance the same admissions contained in his statement, he waived any right to object to the admission of the statement on the ground that he was not advised before the statement was given of his right to counsel or of his right to remain silent. *State v. Dotson,* 239 Or 140, 396 P2d 777 (1964). Under the circumstances of this case it is not necessary to consider the adequacy of the warning which was given defendant before he was interrogated.

■ We also hold for the same reason that defendant was not prejudiced because the court did not make an independent finding concerning the voluntariness of the statement as required since our decision in *State v. Brewton,* 238 Or 590, 395 P2d 874 (1964)

■ Defendant's other assignments of error are

based on the circumstance that the charge against him was resubmitted to the grand jury after the case was remanded by this court to the circuit court for a new trial. Defendant was tried on a new indictment and contends that he was thereby denied due process of law and that his plea of former jeopardy was erroneously rejected by the trial court.

The name of a pathologist who had testified before the grand jury was not endorsed on the first indictment. As a consequence that witness was not eligible to testify at the first trial. The purpose of the resubmission was to qualify the pathologist to testify, his name was endorsed on the new indictment, and he did testify at the second trial. We find nothing irregular or prejudicial in the procedure followed, and no merit in the defendant's assignments of error based thereon. *State v. Reinhart,* 26 Or 466, 473, 38 P 822 (1895); 4 Wharton's Criminal Law and Procedure (1957) § 1733.

We find no merit in defendant's appeal, and the judgment is affirmed.