**William Edward UNSWORTH, Petitioner,**

v.

**Clarence T. GLADDEN, Warden, Oregon State Penitentiary, Respondent.**

**Civ. No. 66–108.**

United States District Court
D. Oregon.

Dec. 13, 1966.

Edward Murphy, Jr., Portland, Or., for petitioner.

Robert Y. Thornton, Atty. Gen. for Oregon, David H. Blunt, Asst. Atty. Gen. for Oregon, Salem, Or., for respondent.

## OPINION

SOLOMON, Chief Judge:

This case is before the Court on William Edward Unsworth's petition for a writ of habeas corpus. He seeks to set aside a jury conviction and sentence of life imprisonment for second degree murder. Unsworth contends that the trial judge improperly admitted in evidence incriminatory oral statements made by him at the time of his arrest when he was so intoxicated that he was unable to make a coherent or voluntary statement, and that he was not warned of his rights as required by Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and State v. Neely, (1964), 239 Or. 487, 395 P.2d 557, 398 P.2d 482 (1965).

Unsworth further asserts that the written statement he signed on the afternoon after his arrest in the District Attorney's office in Klamath Falls was "the result of interrogation and accusation," and that the trial judge should have held a hearing on the admissibility of these statements outside the presence of the jury, in accordance with Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed. 2d 908 (1964).

Finally, he asserts that there was insufficient evidence of intent to satisfy the constitutional guaranty of due process.

The State of Oregon admits Unsworth's intoxication at the time of his arrest, but asserts that his oral statements were admissible because they were made without interrogation and because there was no showing that Unsworth's ability to refuse to answer questions was overpowered "by duress, compulsion or by administration of some external agency," or that his drinking was so excessive and protracted that he became a "madman fully deprived of his reason."

At Unsworth's murder trial, Deputy Sheriff Hutton testified that at 9:35 on the evening of April 15, 1962, he received a collect call from Unsworth in Beatty. Unsworth told him that he was having the "same old trouble," which Hutton interpreted as domestic trouble with his wife. Unsworth asked Hutton to come to Beatty and said, " 'If you don't come down here you might prevent a murder.' "

Hutton testified he told Unsworth, "You don't make sense, you must be drinking." Unsworth replied, "Oh, go to hell," and hung up.

Hutton did not respond to this call. Later that evening he went to Beatty after receiving a call from Bill Walker, Unsworth's employer, asking him to investigate the shooting of Tony Moore.

Hutton arrived at the Unsworth cabin about midnight. With him were Walker and Deputy Sheriff Conroy. Hutton testified that they found Unsworth lying face down on the bed asleep or intoxicated. They awakened him and found that he was unable to get up without slipping and could not stand without help. At different times, Hutton described Unsworth's speech as jabbering, babbling, heavily slurred, and thick tongued. He said Unsworth's remarks were contradictory, and that he was very intoxicated. He testified that Unsworth said, "Poor Tony, I'm sorry, I'm sorry * * *. I never intended to shoot him."

Deputy Conroy testified that Unsworth wanted a clean shirt before being taken by the Deputies to Klamath Falls, but he could not unbutton the one he

was wearing. He began to rip it, so Deputy Conroy helped him unbutton it. Deputy Conroy was helping him put on his clean shirt and was buttoning it, when Unsworth told him to keep his hands off him. Both Deputies described Unsworth as loud and aggressive.

The following portions of the opinion of the Supreme Court of Oregon, taken from the transcript of the testimony of Deputies Conroy and Hutton at the trial, further illustrate Unsworth's condition and contain the statements he made to the Deputies:

"Q. What happened then?

"A. [Deputy Conroy] Well, he finally got the shirt on and part of it buttoned up and under his belt and then he grabbed for his pipe and tobacco and started to fill this pipe. He was having a pretty rough time and I offered to assist him and he told me, 'to get your goddamned hands away' that he could take care of himself.

"Q. Do you remember the exact words that he used at the time?

"A. 'Get your goddamned hands away from me, I'll wait on myself.'

"Q. What happened then?

"A. He staggered around and finally got the pipe filled and looked at me and he said, 'I've got a gun and I'll shoot your guts out, you son of a bitch'.

"Q. Then what happened—where was he when he said that?

"A. Standing by the bed.

"Q. Then, did he say anything else after that?

"A. Well, he raved on quite a little bit and turned around and observed Tony Moore sitting in the chair and he said, 'There is Tony' he says—he says 'He got in my way and I had to kill him.' He said to me again. 'If I had my gun, I'd kill you too, you son of a bitch', that's the words he said."

Hutton repeated in substance Conroy's statements and also testified as follows:

"Q. Was there any other conversation in your presence that you heard?

"A. Yes, Mrs. Unsworth came in and told Mr. Unsworth to shut up and he called her several names.

"Q. Mr. Hutton, we are going to have to know if you can recall the exact words that he said?

"A. He called her a 'dirty son of a bitch and a slut,' and he says 'You're the one that I intended to kill anyway', and he tried to get away from us to get at her.

"Q. Was there any other conversation in your presence?

"A. I heard him tell Mr. Walker two or three times that he shoudn't—he didn't intend to kill Tony and that he was his best friend.

"Q. Anything else?

"A. That's all the conversation.

"Q. You testified a little while ago that you saw some kind of an argument between Mr. Unsworth and Mr. Conroy, did you hear the conversation if any, or any of the argument?

"A. I heard him say that if he could get a gun that he would shoot Mr. Conroy—that he would shoot him, that 'If I could get a gun I would kill you.'

"Q. Now, as far as you can recall right now, was that all of the conversation that you had?

"A. As far as I can recall, yes.'"

State v. Unsworth, 240 Or. 453, 457–458, 402 P.2d 507 (1965).

At approximately 5:00 A.M., April 16, 1962, which was five hours after Unsworth's arrest, Deputy District Attorney Thomas and Deputy Sheriffs Somers and Bogart questioned Unsworth in the Klamath Falls jail barber shop. Thomas testified that he "asked Mr. Unsworth several times as to what had happened and his answers were incoherent for the most part but he did say 'I killed him and I know you are going to get me.' He asked many times to see his wife."

Since he was unable to obtain satisfactory responses to his questions, Thomas had Unsworth taken to a cell.

That afternoon, Sheriff Britton, whom Unsworth called "Red" and considered a friend, questioned Unsworth. Thomas, who also questioned Unsworth, testified that in the intervening ten hours, Unsworth had become sober, that he spoke in normal tones, and was no longer boisterous. Unsworth related the circumstances of the killing and claimed that it was accidental. Toward the end of the questioning, his statement was reduced to writing. The interrogating officers did not warn Unsworth of his rights until they started dictating the statement.

In the written statement, which he corrected and signed, Unsworth admitted that he had killed Tony Moore, but claimed the shooting was accidental. At the trial, he objected to the admission of the written statement on the grounds that it did not contain a record of the entire conversation, and that the officers did not warn him of his rights until after they began dictating the statement.

Unsworth did not object to testimony by Hutton, Conroy, and Thomas about the oral statements he made at the time of his arrest and in the Klamath Falls jail barber shop.

The trial judge allowed the jury to determine the admissibility of the written statement.

After the State concluded its case, Unsworth testified that on April 15, 1962, he invited Tony Moore, with whom he had worked all day, to come to his house for dinner. When Moore had not arrived by eight o'clock, Unsworth went to a neighbor's where he thought Moore might be. Moore was not there. On the way home, Unsworth was stopped by an Indian, who told Unsworth that Indians didn't like white people in Beatty and that he was going to get his gun and run Unsworth out of town or shoot him. These threats made Unsworth uneasy because he knew of three unsolved murders that occurred just before he moved to Beatty. One was in the house where he and his wife were living, and the other two in the house across the street.

Unsworth testified that he called Jack Hutton after his confrontation with the Indian, and complained of the same old trouble, by which he meant threats from Indians. He had called Jack Hutton for protection when he was threatened on prior occasions.

Tony Moore arrived with a half-gallon of wine between nine and ten p. m. While Unsworth, his wife and Moore were drinking their first glass of wine, they heard a noise outside. Unsworth took his rifle, cocked it, and went outside to investigate.

When he failed to find anyone, he returned to the cabin where he attempted to uncock the gun, a lever action Winchester 30–30 with a visible hammer. To uncock it, one must hold the hammer with the thumb and finger of one hand, and pull the trigger with the other, easing the hammer down to its uncocked position. This task was difficult for Unsworth; he had lost the index finger and most of the thumb on his right hand. He was pointing the gun into an unoccupied bedroom and while he was easing the hammer down, his wife shouted, "Bill, put that goddam gun down." He turned. The gun discharged and killed Tony Moore. At Unsworth's request, his wife left the house to call the Sheriff.

Unsworth began to drink the wine. He continued to drink until he lay down on the bed. He testified that he did not remember anything until the following afternoon.

During his testimony, Unsworth admitted that he had been convicted of involuntary manslaughter and received a suspended sentence.

In rebuttal, the State presented a witness who testified that Unsworth's wife told her that Unsworth threatened his wife and fought with her. The Judge ordered this testimony stricken and instructed the jury to disregard it. The witness also testified that on one occasion she saw Unsworth chase his wife with an axe.

The State also called Jack Hutton on rebuttal. He testified that Unsworth

called him to Beatty twice in the fall of 1961, and that on each occasion he had heard Unsworth threaten to kill his wife. Hutton received no calls during the five months prior to the fatal shooting.

The State tried Unsworth on two theories, first that he intended to kill Tony Moore, or that he had accidentally killed Moore while intending to kill his wife. The Judge instructed the jury on both theories, and also told the jury that voluntary intoxication was not a defense to the charge against Unsworth. The Judge did not instruct the jury that it should give less weight to statements made while under the influence of intoxicants.

The jury found Unsworth guilty of second degree murder.

On appeal to the Supreme Court of Oregon, Unsworth, relying on *Escobedo*, supra, contended that the trial judge should have excluded his statements, both written and oral, because the arresting and interrogating officers failed to inform him of his right to remain silent and his right to counsel before he made those statements. Unsworth, relying on Jackson v. Denno, supra, also contended that the trial judge should have held a hearing on the admissibility of his statements outside the presence of the jury and that the trial judge's failure to do it deprived Unsworth of a fair trial.

The Supreme Court held that by taking the witness stand and testifying on his own behalf, Unsworth waived his right to object to the introduction of his written statement, particularly since his testimony on the witness stand was practically identical to the written statement.

The Supreme Court also held that although failure to object to testimony about his oral statements did not bar him from asserting his constitutional rights on appeal, the oral statements made in his home were "made voluntarily by the defendant without any stimulus by the officers", 240 Or. at 459, 402 P.2d at 510. The Court did not mention the oral statement made approximately six hours later, when Unsworth was questioned in the jail barber shop.

■ Unsworth in this Court for the first time specifically contended that his oral statements were not admissible because he was too intoxicated to make a voluntary statement. But in my view this issue is properly before me, first, because Unsworth is not entitled to post-conviction relief on this ground, since it could have been raised by his lawyer on appeal, and, second, because this issue was implicit in Unsworth's contention before the Supreme Court that the oral statements were inadmissible.

■ I find that the written statement was not rendered inadmissible by the officers' failure to warn Unsworth of his rights. Unsworth's trial was completed before the June 22, 1964, decision in *Escobedo*, supra. Since Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), held that *Escobedo* is not retroactive, the failure to warn Unsworth of his right to remain silent and right to counsel until his statement was being taken is insufficient to hold the statement inadmissible on that ground.

■ I do not share the view that since Unsworth testified substantially in accord with his written statement, the statement was admissible regardless of whether he had been afforded his constitutional rights. Had Unsworth received a hearing outside the presence of the jury on the voluntariness of the oral and written statements, the State may have been unable to make a prima facie case, and it would have been unnecessary for Unsworth to have taken the stand.

Assuming that the written statement was admissible, it only connected Unsworth with the killing. It contained no evidence of the intent necessary to support a second degree murder charge.

Educated and cultured people, who occupy positions of importance, when under the influence of liquor often become brazen and insolent, and they bluff, brag and pretend. Their statements made un-

der these circumstances may indicate a general hostility and a longing to be powerful, but that would not establish an intent to murder.

Unsworth was a poor, illiterate laborer. Just after he was aroused from a deep sleep induced by drinking a large quantity of wine and while he "staggered around" and "raved," he threatened to kill the Deputy Sheriff who tried to help him dress.

It would be hard to believe that any court would have permitted him to be convicted on his threats to the Deputy Sheriff. Yet the trial court admitted Unsworth's remarks made at the same time to his wife and the remarks he made about Moore. They became the basis for a jury finding that Unsworth was guilty of murder either because he deliberately intended to kill Moore or because he accidentally killed Moore when he intended to kill his wife.

██ The undisputed evidence shows that Unsworth at the time of his arrest was too intoxicated to make a voluntary statement and that the statements he made were "the product of a mind benumbed or confused by alcohol, made at a time when the defendant himself had no understanding or realization of what was going on or what he was saying", and therefore were inadmissible. McAffee v. United States, 1940, 72 App. D.C. 60, 111 F.2d 199, 200.

██ In my opinion the failure of the trial court to exclude the oral statements made by Unsworth at the time of his arrest deprived him of due process. I am also of the opinion that Unsworth was deprived of his federally protected constitutional rights when the trial court, in the circumstances of this case, failed to warn the jury to give less weight to Unsworth's oral and written statements made while under the influence of alcohol than to statements made while he was sober. State v. Anderson, 247 Minn. 469, 78 N.W.2d 320 (1956).

Warden Gladden shall release the petitioner from custody unless the State of Oregon grants him a new trial in accordance with this opinion.

This opinion shall constitute findings of fact and conclusions of law under Rule 52(a), Federal Rules of Civil Procedure.

Petitioner's application for a writ of habeas corpus is granted.