571 P.2d 527 (1977)
STATE of Oregon, Respondent,
v.
Richard Harlen CLASSEN, Appellant.
Court of Appeals of Oregon.
Argued and Submitted September 23, 1977.
Decided November 15, 1977.
*528 Gary L. Hooper, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.
John W. Burgess, Asst. Atty. Gen., Salem, argued the cause for respondent. With him on the brief were James A. Redden, Atty. Gen., and W. Michael Gillette, Sol. Gen., Salem.
Before SCHWAB, C.J., and RICHARDSON and JOSEPH, JJ.
JOSEPH, Judge.
Defendant appeals from his conviction on charges of burglary and theft.
On May 15, 1975, the complaining witness hired two men, one black and one white, who had come to her home soliciting yard work. After the two men had worked for a few minutes while their employer remained with them working and answering questions, the black man asked to use the toilet. He went into the house, and the complainant remained outside with the other man. After several minutes she became suspicious and went into the house to find out why the black man had not returned. He was gone. She quickly discovered that several valuable items were missing. She then rushed back outside and found that the white man had also disappeared. Shortly after the incident, complainant gave descriptions of the two men to a police officer. She described the white man as about 24 years old, less than six feet tall, of slender build, weighing about 150 pounds, having short light brown hair and a Vandyke beard and wearing blue jeans and a blue shirt.[1]
Defendant assigns as error the denial of his motion to suppress testimony about a photographic identification process. Prior to the first trial, which ended in a mistrial, there was a hearing on a motion to suppress. The complainant said the pictures allegedly used in the throwdown which were shown to her at the hearing were not the ones she had seen in her home. She remembered the ones from which she had made the identification as having been small single pictures; the ones shown her at trial were three views of each subject. She also said there had been 12 or more pictures, including both black and white subjects, and that the pictures might not have been in color. The officer who conducted the throwdown said the pictures at the hearing were the same ones he used in her home. The complainant remembered she had selected two pictures of white men *529 from the array and then picked one of those. The officer's testimony was substantially the same with respect to the white men.[2] She could not identify the defendant in the courtroom as the perpetrator.[3] The motion to suppress the identification evidence was denied, and the case went to trial immediately.
The next day the complainant testified for the state before the jury. On her direct examination she said the officer who showed her the pictures had said nothing to her about the people in them before the throwdown, even though the day before both she and the officer said he had told her he thought the perpetrator's picture was in the array. She was even less sure at the trial about the number of pictures she had seen and also said, "I couldn't swear that they are the same ones." She said the two pictures she picked out had been a "colored man and the white man."[4] Again she could not identify the defendant in the courtroom.
The officer's testimony was in all respects the same as at the suppression hearing. He identified the photo selected by the complainant, said it was a photo of defendant and pointed out the defendant as the man in the photo. Two of the seven men depicted were heavily built. Another had very long hair. Although each of the seven had a mustache and one had the appearance of not having shaved very recently, defendant was the only one who had what could fairly be described as a beard. He was also the only one pictured wearing blue jeans and a blue shirt.
For reasons not relevant here there was a mistrial. Before the retrial defendant renewed his motion to suppress the photo identification testimony. No new testimony was received at the hearing on the motion, presided over by the same judge who conducted the earlier proceedings. The transcripts of the relevant portions of those proceedings were before the court and were reviewed. The judge ruled that the matter of the identification was simply a question of fact for the jury and denied the motion. He saw the issue as one simply of a resolution of conflicts in the testimony.
Were we writing on the proverbial clean slate, we would tend to agree. What we have in the evidence is attenuated testimony by the complaining witness that she was shown some pictures by an officer, that she had picked out a picture of one as the man who victimized her, that the pictures shown her in the courtroom were not the pictures she had viewed, and that she could not *530 identify the defendant in the courtroom as the man. We also have the believable testimony of the police officer that he showed her the photos presented in court, that she had picked out one and that that one was of the defendant. So described, the situation is a classic one in which a jury traditionally would resolve conflicts and weigh the evidence. The slate is not clean, however, since United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969); Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970); and Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).
The psychological assumption that eyewitness identifications are inherently untrustworthy has resulted in a body of constitutional law that invites the injection of a due process issue in every case where an out-of-court identification is sought to be used against the defendant. Where the police have used a photographic identification method in their investigation, every case is now of constitutional significance and the question may always be raised whether the photographic display was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, supra, 390 U.S. at 384, 88 S.Ct. at 971; State v. McBain, 24 Or. App. 737, 547 P.2d 188, Sup.Ct. review denied (1976); State v. Bush, 29 Or. App. 315, 563 P.2d 747 (1977). It is no longer adequate merely to treat the problem by leaving the identification issue to the jury.
Answering the question, we were told in Simmons, involves the "standard" of considering each case "on its own facts." In State v. McBain, supra, we applied Simmons where the complaining witness could not make a courtroom identification but did testify that she had positively identified the defendant in an out-of-court throwdown. The pictures there were nine in number; only one showed a darkly bearded and heavyset man  the defendant. We held the process there "was conducted in such a manner as to be impermissibly suggestive" because the photo array was so constituted as to cause the witness to identify the defendant.[5] In State v. Bush, supra, the only links between the defendant and the crime were the seven-year-old victim's courtroom identification made "[b]ecause it looked like a man I saw in the pictures" and the police reports describing her out-of-court identification. The pictures originally shown her included only one of a person with a mustache  the defendant. We held that in "the totality of circumstances" the identification process was constitutionally infirm, and reversed the conviction.
The standard applied in Bush anticipated the approach of the United States Supreme Court in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). In that case the court rejected a constitutional challenge to the admission of photographic identification testimony despite the suggestiveness of the procedure.[6] An experienced police officer had observed the suspect while making an undercover drug purchase from him with the expectation of a future arrest and prosecution. He described the man to fellow officers, and two days later he identified the suspect as the man shown in a single photograph placed on his desk by one of those officers. He also made a positive in-court identification.
*531 It is by no means obvious how any reasonable question could have been raised about the so-called identification procedure involved in Manson. A police officer operating in the field had purchased narcotics from an unknown person. He furnished a description to fellow officers, one of whom was astute enough to tie the description first to his memory and then to a picture. The field officer recognized the picture. That led to further investigation and to the arrest of the defendant at the very place where the purchase had been made. Thereafter the officer who had made the purchase positively identified the defendant as the vendor. It is not easy to spot the due process implications in that story. Still, the state acknowledged that "the procedure in the instant case was suggestive and unnecessary." 432 U.S. at 109, 97 S.Ct. at 2250, 53 L.Ed.2d at 151. Apparently the high court took the case to resolve a conflict in the federal circuits between those courts applying a "per se rule of exclusion" and those relying on "the totality of the circumstances."
The court found several interests to be involved in the line of cases beginning with Wade. The first is that of ensuring that eyewitness testimony shall have "aspects of reliability"; the second is to deter the police from using unnecessarily suggestive procedures; and the third "is the effect on the administration of justice." The objective is the attainment of the degree of fairness required by the Due Process Clause. The court concluded that reliability in the light of all the circumstances is the "linchpin." It then listed five analytical issues derived from Biggers: the opportunity to view, the degree of attention, the accuracy of the description, the witness' level of certainty, and the time between the crime and the confrontation.
The trial judge here did not have the benefit of Manson, and we cannot tell from the record the details of his mental process in deciding not to suppress. All we know is that the trial court said:
"I'm going to rule that, I think it makes out a question of fact for the jury, for the old lady just couldn't pick him out and couldn't identify him, but I think it makes out a jury question. On that point, to suppress the testimony of Mrs. Barth, that part of your motion is denied."
Given that, it might seem appropriate to send the case back for the trial judge expressly to apply the Manson factors. However, Manson tells us that that is our role on review.[7]
1. The opportunity to view. The complaining witness first observed the men *532 who robbed her when they came to her house in the morning asking for work. She walked around her yard with them, describing the work to be done. They then left. They returned in the afternoon and began work. She was with the white man in her yard for at least 15 minutes. She had a good opportunity to view and she used it.
2. The degree of attention. The complaining witness was under no stress or strain and was involved both in instructing the putative workmen and in working alongside them. While she had no special reason to study them closely, she certainly had clear and unobstructed views of them both in the morning and in the afternoon.
3. The accuracy of the description. Within a few minutes of the incident she gave a report to a policeman. What he wrote down as her description conflicted with what she testified she had said in respect to height. Her description did not precisely match either the man in the photograph or the defendant in the courtroom with respect to weight or facial hair. It is clear from the record that her memory of a Vandyke beard caused her some hesitancy in the photo identification process and prevented her from being able to make a courtroom identification, but it did not cause her to be unable to identify the man in the photo. The weight discrepancy did not affect the identification.
4. The witness' level of certainty. There is no dispute in the record between the witness and the police officer who conducted the identification process that she picked out a photograph of the white man who had been at her house in May or that she was at that time bothered because she remembered the Vandyke beard. She did identify one of the pictures as the man who had victimized her, and the officer testified that the photograph she picked out was the photograph of the defendant. In her suppression hearing testimony she was certain that the photo she had picked out was of the white man who had been at her home.
5. The time between the crime and the confrontation. The witness' description of the white man was given shortly after the incident. Seven months later she was shown the photographs. In that interval her memory had not dimmed very much, but by the time of the first suppression hearing her memory of the details of the identification process was weak. At the time she was shown the photographs she was under no pressure to remember anything she didn't in fact remember, and she was afforded time for reflection and care.
As in Manson, we would be hard put to say that on that day in December she was likely to make a misidentification. It would have been better had more care been paid by the police officer to the selection of appropriate photographs to eliminate the suggestiveness of having only one subject pictured with a beard. Further, it would have been better practice had the police officer not indicated to the witness that the array was believed to contain a picture of the guilty person. The sort of confusion that occurred here about the process could have been avoided by requesting the witness to mark in some manner the photographs she viewed. Nevertheless, we conclude that her testimony, taken with that of the investigating officer, was sufficiently reliable that a jury could in fairness be trusted to resolve the conflicts and weigh the testimony. The motion to suppress was properly denied.
This is not the end of our inquiry concerning identification. Defendant urges that he was entitled to a cautionary instruction concerning identification evidence, especially because identification of him as the man who was at the complainant's house on May 15, 1975, was the heart of the state's case and his defense. The complaining witness did not identify the defendant at the trial; the actual identification was made by the police officer who had conducted the photo identification procedure. Defendant did not take the stand, and the principal thrust of his defense was to challenge the identification. He requested an instruction based on the model approved in United States v. Telfaire, 152 U.S.App.D.C. 146, 152, 469 F.2d 552, 558 (1972), but the trial court gave neither that instruction nor any *533 instruction expressly relating to identification testimony.
Although we have previously referred to Telfaire (State v. Ollison, 16 Or. App. 544, 555, 519 P.2d 393 (1974), we have never specifically approved that instruction and we do not do so now. It is prolix, it tends to overemphasize the issue, and it contains elements that amount to comments on the evidence. If an identification instruction should ever be appropriate in a particular case, a more concise, proper one can be drafted. See State v. Calia, 15 Or. App. 110, 114, 514 P.2d 1354 (1973), Sup.Ct. review denied, cert. denied 417 U.S. 917, 94 S.Ct. 2621, 41 L.Ed.2d 222 (1974). A defendant is entitled to have his theory of the case presented to the jury if the testimony supports it and if he requests a proper instruction. The Telfaire instruction was properly refused, and the defendant requested no other. In the absence of a proper request, there was no error. State v. Ollison, 16 Or. App. 544, 519 P.2d 393 (1974).
Defendant assigns as error the trial court's permitting the state to call as a witness a man who had confessed to the burglary of complainant's house. The witness, who was then an inmate at the Oregon State Penitentiary, had made it clear in an in camera proceeding that he would refuse to testify even if granted immunity because he faced a long stay in prison on other convictions and feared for his safety if labeled a "snitch." He had not been tried for his participation in this burglary. Following that refusal to testify and a grant of immunity, he was allowed to be called by the prosecution as a witness. He was asked if he and the defendant had had occasion to go to the complainant's residence on May 15, 1975, posing as laborers. He again refused to testify in the presence of the jury.[8]
The defendant agrees that if the witness was properly granted immunity he could not have incriminated himself by testifying, and therefore under State v. Abbott, 275 Or. 611, 552 P.2d 238 (1976), he had no right to refuse to testify. He argues the Supreme Court noted in a footnote in Abbott (275 Or. at 617, 552 P.2d 238) that there may be other motives than protection against self-incrimination which would cause a witness' refusal to testify from which inferences adverse to the defendant might be drawn. That is defendant asserts that there is an implicit exception in Abbott to the effect that a witness may not be called before a jury after a grant of immunity if it is known that he will still refuse to testify on grounds allowing the jury to draw an inference against the defendant. We think that argument misconstrues the point of the footnote. The only privilege the witness here could have had in the circumstances was to refuse to incriminate himself. Once immunity was granted, he could no longer incriminate himself. He had no privilege not to testify based on any other motive, and it was proper for the jury to hear him assert a nonprivileged refusal to testify, whatever might be the inferences to be drawn from that refusal.[9]
Defendant assigns as error his motion for a mistrial based upon a claim that hearsay testimony was improperly admitted. The relevant portions of the testimony are set out in the margin.[10] The first quoted *534 testimony was given in explanation of why the officer happened to come into contact with the complaining witness on December 18. In that context, the evidence did not involve the truth or falsity of anything said by Fuller, and nothing depended on his credibility. See McCormick, Evidence 584, § 246 (2d ed. Cleary 1972). Even if the testimony was about an act amounting to an expression, it was not subject to the hearsay rule.
The second quoted testimony was offered to provide the background for testimony about defendant's admissions. Fuller's confession was used by the officers as an inducement for the defendant to admit his participation in the crime. Defendant acknowledges *535 "in theory at least" that the testimony of what Fuller had said was not offered to prove that what he said was true. Defendant asserts, however, that the admission of the testimony was highly prejudical and that there was no need to present it. He claims, therefore, that it should have been excluded.[11] Testimony about Fuller's statements was not offered as evidence that he or the defendant had committed the crime but to show the circumstances under which the defendant made incriminating statements. Whether or not the defendant had made the statements at all and whether the statements were voluntary were both at issue. In that context the testimony was not hearsay and was properly admitted.
Defendant was sentenced for both burglary and theft, contrary to State v. Woolard, 259 Or. 232, 484 P.2d 314, 485 P.2d 1194 (1971). The issue was not raised at the time of sentencing. In State v. Webber, 14 Or. App. 352, 513 P.2d 496 (1973), we considered a claim that the rule in Woolard had been violated even though it had not been asserted at trial; we also warned that the bar could not assume we would "do so again." Subsequently, the Supreme Court in State v. Leathers, 271 Or. 236, 531 P.2d 901 (1975), held that a sentence not "* * * in conformity with the governing statute * * * is void for lack of authority and thus totally without legal effect. * * *" The issue there was whether the statute (ORS 137.140) conferred certain authority on the sentencing court with respect to place of confinement. In Woolard the issue was whether the legislature intended a conviction for burglary to work a merger of the theft charge. Finding a merger was intended, the court held there could not be two sentences. Although Woolard is not very clear on the point, it would seem a part of the logic that the theft sentence in that case was merely erroneous and voidable, not void. Here the charges were exactly the same as in Woolard, and there can be no doubt that the rule was violated. Given Rule 7.19, Rules of Procedure of this court, we need not reach the void-or-voidable question; the sentence was erroneous on the face of the record. Defendant is entitled to be resentenced.
In the course of discovery the court turned over to the prosecution certain investigative reports prepared for the defendant. Arguably at least, some of those materials were not subject to discovery and should not have been made available to the prosecution. Defendant argues that he was therefore entitled to have the charges dismissed. No showing has been made that the error in any manner affected the effectiveness of the defense; at most it deprived defendant of the possible tactic of surprise. The record makes very clear that defendant was not denied the effective assistance of counsel. Dismissal would not have been appropriate. See, Fajeriak v. State, 520 P.2d 795 (Alaska 1974).
Remanded for resentencing.
SCHWAB, Chief Judge, dissenting.
I would reverse and remand for a new trial on the ground that the identification evidence should have been suppressed. After developing that point, I will briefly note my disagreement with the majority's treatment of one other issue: instructions-on-identification evidence and the sentencing problem.
The majority correctly states the constitutional rules governing the admissibility of identification evidence. Those rules may be ephemeral, but they are the United States Supreme Court's last word on the subject. The problem lies not in stating the rules, but in applying them, as has been true before. See State v. McBain, 30 Or. App. 1055, 569 P.2d 630 (1977); State v. Bush, 29 Or. App. 315, 563 P.2d 747 (1977); State v. McBain, 24 Or. App. 737, 547 P.2d 188, Sup.Ct. review denied (1976).
*536 We can be guided, however, in applying vague rules by prior applications of those same rules. The first McBain case, 24 Or. App. 737, 547 P.2d 188, held identification evidence inadmissible when: (1) it was likely that the rape victim's degree of attention was extremely high  to the point of engraving a memory picture on her mind; and (2) only a few days passed between the crime and the photographic display. Likewise, Bush was a sex offense case in which the victim's degree of attention was probably high and in which the victim was shown an array of photographs immediately after the crime, but in which we held the identification evidence was inadmissible.
Assuming McBain and Bush were correctly decided, as the majority apparently does, this case even more clearly requires suppression of the identification evidence. Here the victim was relatively inattentive  she did not even know a crime was being committed  compared to the sex crime victims in McBain and Bush. Here the length of time between the crime and the photographic display was seven months, rather than the matter of hours or a few days involved in McBain and Bush.
Moreover, applying the accuracy-of-the-description and level-of-certainty tests to this record is a real challenge because there are so many versions of the relevant facts. A police officer's report, written shortly after the crime was discovered, states the victim described the white burglar as five feet, four inches tall, of slender build and weighing 150 pounds. In fact, defendant is six feet tall and weighs over 200 pounds. The victim presented three different versions of the description she gave the officer and of the identification process: one at the suppression hearing, another at the original trial that was aborted and yet another at the subsequent trial that leads to this appeal.
When the victim selected defendant's picture from the throwdown seven months after the crime, her level of certainty was not high. First she could not choose between two pictures of men she thought looked like twins. She finally selected defendant's picture but consistently expressed doubts because her memory of the style of the white burglar's facial hair was different than what was portrayed in defendant's picture.
"Against [the above-discussed] factors is to be weighed the corrupting effect of the suggestive identification itself." Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140, 154 (1977). As the majority seems to acknowledge, the photographic display in this case was highly suggestive. The victim was told that the white burglar's picture was among the group of seven she was shown. Only one of the photographs  that of the defendant  showed a man with a beard. As I interpret the record, the victim had a fixation about the white burglar's beard. Under these circumstances, I do not find it surprising that the victim selected defendant's picture. Therefore, I conclude that there was a substantial danger of misidentification and that the identification evidence was not sufficiently reliable to be admissible. Indeed, I regard the reliability of the evidence to be substantially less in this case than it was in McBain and Bush.
In considering the multiple-convictions and sentences issues, the majority cites State v. Webber, 14 Or. App. 352, 513 P.2d 496 (1973), which requires the issue to be raised in the trial court in order to be preserved on appeal, but then proceeds to disregard that rule. This court has previously applied the Webber rule, e.g., State v. Ortega, 20 Or. App. 345, 531 P.2d 756, Sup.Ct. review denied (1975), and extended it to related situations, e.g., State v. Allen, 25 Or. App. 57, 548 P.2d 169, Sup.Ct. review denied (1976). Webber, Ortega and Allen should either be followed, or distinguished or overruled; they should not be ignored.
As for whether this problem is egregious error apparent on the face of the record, our rules had the same provision in them *537 when Webber, Ortega and Allen were decided. Since our court rules have been consistent, I cannot understand the inconsistency between our prior approach and the majority's approach today.
In any event, I do not think it is necessary to reach the cautionary-instruction or multiple-convictions issues. I would reverse on the ground that the identification evidence was inadmissible. I, therefore, respectfully dissent.
NOTES
[1] There were some conflicts between the officer's report of her description and her testimony about what she told him, but the conflicts are assumed to have been resolved by the trial court in the manner most supportive of its ruling. Ball v. Gladden, 250 Or. 485, 443 P.2d 621 (1968).
[2] The officer testified that he had never read the whole incident report of the officer who originally interviewed the complainant on the day of the crime, so he was not aware of the physical descriptions she had given. The complainant, he said, remarked after picking out defendant's picture: "She thought that he had a Vandyke beard at the time of May 15th."

No objection was raised at the suppression hearing or trial to the officer's testimony about the victim's having picked out a photograph in the throwdown. There are Oregon cases holding that sort of testimony inadmissible as hearsay. State v. Houghton, 43 Or. 125, 71 P. 982 (1903); State v. Evans, 98 Or. 214, 192 P. 1062, 193 P. 927 (1920); State v. Lanegan, 192 Or. 691, 236 P.2d 438 (1951). This issue is not presented here (State v. Nunes, 251 Or. 49, 444 P.2d 542 (1968)), but the trend of the more recent cases is that such testimony is admissible if the identification witness is available at trial for cross-examination. See United States v. Irby, 517 F.2d 506 (4th Cir.1975), cert. denied 424 U.S. 973, 96 S.Ct. 1475, 47 L.Ed.2d 742 (1976); Niblett v. Commonwealth, 217 Va. 76, 225 S.E.2d 391 (1976); Gilbert v. California, 388 U.S. 263, 272, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); see also, I Wharton, Criminal Evidence § 187 (Torcia, 13th ed. 1973); Annotation, 71 A.L.R.2d 449, 482 (1960), 64-72 A.L.R.2d Later Case Service 499, et seq. (1967).
[3] At trial the defendant was cleanshaven and his hair was cut short. He was dressed differently than he was in the photograph. The throwdown picture shows a person who is of a heavier build than described by the complainant, but the record does not disclose that the difference in weight affected her identification at the throwdown or influenced her failure to identify at the trial.
[4] At the suppression hearing she said she had first selected a black man and two Caucasians from the pictures and then selected one of the Caucasians as "the white man."
[5] On the retrial a different method of identification was used, which we upheld on appeal. State v. McBain, 30 Or. App. 1055, 569 P.2d 630 (1977).
[6] It is of passing interest that in only one case has the Supreme Court reversed a conviction because its due process standards on identification were violated: Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). Even that result is ambiguous: The case was remanded to the trial court for reconsideration in the light of the "harmless error" rule.
[7] In Ball v. Gladden, supra, n. 1, the Supreme Court explained its view of the scope of review in cases involving voluntariness of admissions and confessions. The determination of "what actually transpired" was said to be for the trier of fact. If the facts were found, and if there was evidence to sustain the findings, they will be accepted on review. If the facts were not explicitly found, or if the findings of fact were not complete, and if the evidence goes more than one way, it will be presumed "that the facts were decided in a manner consistent with the ultimate conclusion." The next question is whether those "historical facts" are constitutionally sufficient to support the ultimate finding on the due process issue. That determination is for the reviewing court. Justice O'Connell, specially concurring in Miotke v. Gladden, 250 Or. 466, 468, 443 P.2d 617, 619 (1968), described the process as "the application of a constitutional principle to those [historical] facts." He pointed out that it is the reviewing court's power and duty to identify the point when a supposed dispute on the facts has to be converted into a principle of law and taken from the trier of fact. In the admission/confession cases, that point comes when voluntariness is reached. In identification cases, that point, denominated "the linchpin" in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), would be reliability.

It is not clear whether Ball is entirely congruent with Manson, for the opinion in the latter case reads as if the Supreme Court undertook to make an independent determination of the historical facts. That reading may not be accurate, for there does not appear to have been any factual dispute in Manson. There are facts in dispute here. Consistently with Ball, we assume that the trial judge, in disposing of the motion to suppress, determined the facts in a manner to support a conclusion of reliability. We review those facts to determine whether we agree that the identification was sufficiently reliable that it was fair to put the issue to a jury.
[8] The witness' attorney asserted the Fifth Amendment on his behalf, but the witness himself said that his reason for refusing to testify was "`Cause I'll get a knife in the back right there."
[9] Defendant also contends that the statutory procedures for compelling a witness to testify (ORS 136.617) were not followed. Although the witness might have raised that point in an appeal from his contempt conviction, it cannot be raised by this defendant.
[10] "[DEPUTY DISTRICT ATTORNEY]:

"Q Detective Christensen, when with respect to approximately December 18th of last year was your conversation with Mr. Fuller?
"A A few days prior to that.
"Q All right. And during any part of this conversation were you riding around in a vehicle with Mr. Fuller?
"A Yes.
"Q That was you and Detective Peterson also?
"A Yes.
"Q Riding around with Mr. Fuller, did you have occasion to go to Southeast King Road in Milwaukie?
"A Yes.
"Q And with respect to Mrs. Barth's residence on Southeast King Road, was that residence brought to your attention by anyone?
"[DEFENSE COUNSEL]: Objection, your Honor, it's hearsay.
"THE COURT: No, I'll overrule the objection, you may answer.
"THE WITNESS: Yes, it was drawn to my attention.
"[DEPUTY DISTRICT ATTORNEY]: By whom?
"A By Mr. Fuller.
"* * *
"[DEPUTY DISTRICT ATTORNEY]:
"Q Officer, did you understand the question I asked you last, what your conversation was, what statements you made to him, what response, if any, he made to you?
"A Yes.
"Q Would you tell us what the substance was?
"A We told the defendant that Mr. Fuller had admitted to us numerous burglaries he committed.
"[DEFENSE COUNSEL]: Your Honor, I move for a mistrial. Again we are now talking about burglaries.
"THE COURT: He is talking about Mr. Fuller. I'm going to let him proceed, motion denied. You go ahead.
"THE WITNESS: And that one of the burglaries that Mr. Fuller had told us Mr. Fuller had committed was the Barth residence located at 7410 Southeast King Road.
"[DEFENSE COUNSEL]: Your Honor, I must object, I don't want to be on my feet more than necessary.
"THE COURT: You have a duty to do this, don't apologize for defending your client.
"[DEFENSE COUNSEL]: There is no foundation, this is complete hearsay as far as Mr. Fuller is concerned. If Mr. Fuller is making any admissions, he is not charged in this case, so it can't be an admission of a co-indictee. This is complete hearsay.
"THE COURT: The objection is overruled, you may proceed.
"THE WITNESS: I told Mr. Classen that the Barth residence, I told him Fuller told me that it was a residence where he went with another person, that Fuller had told me Fuller was dressed in maintenance laborer type clothes, that he was wearing a blue colored hard hat and he and another person went to this residence posing as laborers and were hired by an elderly woman at that residence to move some rocks about in the yard.
"[DEPUTY DISTRICT ATTORNEY]: Okay, did you talk to him about any particular property that was missing?
"A Yes.
"Q In that respect, what did you say?
"A I told him that after that day Richard Fuller told us some property was missing there.
"* * *
"[DEFENSE COUNSEL]: Excuse me just a moment, please.
"Your Honor, on behalf of Mr. Classen, I again respectfully renew my motion for a mistrial based on the allowance of the testimony of statements made by Mr. Fuller during his interview by Detectives Christensen and Peterson.
"As you will recall, yesterday you Honor allowed testimony in that Mr. Fuller acknowledged that he had been involved in the burglary and theft at the Barth residence on the date in question. Mr. Fuller is not a party in this case. I know of no exceptions to the hearsay rule, your Honor, allowing that sort of hearsay testimony in.
"Now, it may have been offered by [the deputy district attorney] with the theory that it would explain what led up to the eventual questioning of Mr. Classen; but I would suggest to the court that whatever probative value it had was far outweighed by the prejudicial effect on this jury.
"The jury has heard statements of hearsay attributed to Mr. Fuller that he admitted that he was involved in this crime, and I say that is highly prejudicial, it's hearsay, and should not have been permitted into the proceedings.
"THE COURT: Motion for a mistrial is denied."
[11] No limiting or cautionary instruction was requested or given.