*[927] TANZER, J.
Defendant was indicted for first degree robbery and, following a jury trial, was convicted of robbery in the second degree.[1] He appeals contending that the trial court erred in admitting certain evidence.
The charges arose out of the reported robbery of a service station in Glendale, Oregon. The attendant testified that at approximately 6:20 p.m. on November 21, 1975, two men, riding in an old black Pontiac automobile, entered the station and ordered oil and gasoline. One of the men then pointed a pearl-handled, chrome-plated automatic pistol at the attendant and ordered him to open the cash register. The assailant then told the attendant to lie down on the floor and threatened to kill him if he offered resistance. Approximately $100 was taken from the register.
The attendant described the assailant as having curly black hair and stated that the other occupant of the car had blonde hair past his shoulders. Defendant’s hair is black and wavy. His co-defendant, Dale Perea, has shoulder-length brown hair.
On January 5, January 27 and March 17,1976, the police showed groups of photographs to the attendant. The same picture of defendant was included in the first two throwdowns; a different photograph of *[928] defendant was used in the third throwdown. The attendant did not identify his assailant in the first two photographic arrays, but he positively identified defendant’s photograph in the third as the robber. At trial, he also made an in-court identification.
Defendant represented himself at trial and was assisted by a lawyer. He contended that, while en route from Washington to San Bruno, California, he and Perea stopped at the service station for gasoline and oil on the night in question, but that they did not commit the robbery. He corroborated his denial by explaining that, because he was suspected in a San Bruno robbery, he would not rob another one on his way to discuss the matter with the San Bruno police. The logic of that, of course, was for the jury to assess.
I
Lieutenant Hugh Fraser of the San Bruno Police Department, who was personally acquainted with both defendant and Perea, testified for the state about a conversation regarding the events at the Glendale service station which he had with defendant after he arrived in San Bruno. During cross-examination by defendant, the following exchange took place:
"Q Do you know to your knowledge of Mr. Poole ever having a weapon registered under his name?
"A Not to my knowledge, no.
"Q Have you ever known Mr. Poole to own a chromeplated automatic pistol of a .25 caliber or .32 caliber?
"A Personally, no, I have not.”
In response to this testimony, on redirect examination, the following occurred:
"Q Lt. Fraser, within your experience with the defendant [has he] been known to possess weapons or the semblance of weapons?
‡ ‡ ‡
"A Yes.
"Q What types of weapons and other things?
*[929] "A In the early part of November of ’75, Mr. Poole was stopped in a car in Seattle, a case that I had occasion to review — see the evidence in.
"MR. McGINTY [defendant’s counsel]: Your Honor, I’m going to object to that as hearsay.
"THE COURT: Did you actually receive some evidence?
"THE WITNESS: I did, your Honor.
“THE COURT: And if I recall, Mr. Poole’s inquiry opened up the question as to whether this witness had any knowledge of Mr. Poole being in possession of weapons of a particular kind, and as such I think he’s opened the door. You may go ahead.
"THE WITNESS: Yes. In the early part of November of that same year, 1975, Mr. Poole was stopped in a car in Washington, and at that time there was some weapons that could have been used in the commission of a robberty. They were forwarded to me, along with sets of gloves, ski masks, wigs.
"Q BY MR. LEE [the prosecutor]: Have you had knowledge of him having weapons at any other times?
"A Specifically, no.
"Q Okay. This incident in Washington earlier in November, were the — your statement was somewhat hard to understand — some items that could have been used in a robbery, were there firearms?
"A They were — well, there was a make-believe sawed-off shotgun, a cap gun and a chromeplated derringer.
"Q Okay. Was there any ammunition at that time?
"A Yes. There was some ammunition, .22 ammunition, yes, that was not make-believe.
"Q Then you indicated this other paraphernalia. Was that sufficient — well, how did you come into possession of this evidence?
"A It was forwarded to me by the agency that recovered it, which skips my mind right at this minute.
"Q Okay. I take it then that they took it away from Mr. Poole?
"A They seized it and forwarded it to me at my request.”
*[930] Subsequently, both defendant and Perea testified as to the circumstances surrounding the seizure of the items in Washington. During the state’s cross-examination of Perea, he identified several state exhibits as the actual items seized by Washington authorities. Thereafter those exhibits were received in evidence over defense objection.
Defendant contends that Lt. Fraser’s testimony regarding the Washington stop and seizure of items was non-excepted hearsay which should have been excluded. Hearsay is an out-of-court statement offered to prove the truth of the matter stated. See, State v. Kendrick, 239 Or 512, 515, 398 P2d 471 (1965); McCormick, Evidence 584 (2d ed E. Cleary 1972).
 The testimony here challenged is not hearsay because Lt. Fraser did not testify to the existence of an out-of-court declaration regarding the Seattle stop and seizure. Rather, he testified as to matters of which he had no personal knowledge. The distinction between hearsay and incompetent testimony not based upon the witness’ personal knowledge is a subtle one which has been frequently overlooked. See, Robertson v. Coca Cola Bottling Co., 195 Or 668, 247 P2d 217 (1952); McCormick, Evidence 586, §§ 20-21 (2d ed E. Cleary 1972). McCormick notes that the requirement that a witness testify upon personal knowledge predates the hearsay rule and rests upon the same basic incompetency rationale. Because both types of evidence are closely related their exclusion serves the same policies and they are distinguished only by their form, we hold that an objection based on hearsay is sufficient to inform the trial court of the nature of the objection and to preserve on appeal a challenge to testimony based upon lack of personal knowledge. Therefore, since Lt. Fraser’s testimony regarding the events in Washington and items which were seized there was based upon the relation of others rather than upon his personal knowledge, it was incompetent and its admission was error.
*[931] Defendant’s and Perea’s subsequent competent testimony explaining their possession of the items seized by Washington authorities did not cure the erroneous admission of Lt. Fraser’s testimony or constitute a waiver of defendant’s objection to it. Once the jury had been informed of the event, there is no reason to require defendant to ignore it for the remainder of the trial in order to preserve his right to appeal. The defense is entitled to attempt to explain its version of what happened without forfeiting its right to challenge the error on appeal. See, McCormick, supra at 128, 132-33.[2]
The state contends that the error, if any, was not only harmless, but was actually favorable to defendant because the evidence of his possession of a chrome-plated imitation pistol is the only conceivable basis upon which the jury would have found defendant guilty of robbery in the second degree rather than the first. Besides the fact that defendant neither sought nor welcomed this forensic blessing, it is neither innocuous nor benign. It indicates that defendant committed the robbery itself, regardless of its degree. The wigs might explain why the attendant said that *[932] the other robber had blonde hair when Perea’s hair was brown. Possession of a toy chrome-plated gun ties defendant to the robbery. Because it is likely that the jury’s verdict was affected, the erroneous introduction of Lt. Fraser’s testimony was prejudicial and requires reversal and remand. State v. Van Hooser, 266 Or 19, 511 P2d 359 (1973).[3]
n
Defendant also argues that it was error to admit evidence of the attendant’s in-court identification because it was tainted by prior impermissibly suggestive photographic throwdowns. Simmons v. United States, 390 US 377, 88 S Ct 967, 19 L Ed 2d 1247 (1968); State v. Bush, 29 Or App 315, 563 P2d 747 (1977). Because the issue is likely to arise again upon retrial, we consider it here.
Defendant’s contention is apparently based upon the fact that after two failures to identify his assailant, the attendant finally identified defendant in a third throwdown nearly four months after the robbery. The attendant’s initial inability to identify defendant may well undermine the credibility of his subsequent identification. If so, however, it is for the jury to decide. We hold that the identification procedures were not so impermissibly suggestive as to create a substantial risk of permanent misidentification. Therefore, suppression of the identification evidence was neither constitutionally required nor procedurally proper. State v. Classen, 31 Or App 683, 571 P2d 527 (Nov. 15, 1977).
Reversed and remanded for new trial.

The major difference in the two crimes, as they relate to this case, is that between an actual and a purported weapon. ORS 164.415(1) defines robbery in the first degree:
"A person commits the crime of robbery in the first degree if he violates ORS 164.395 and he:
"(a) Is armed with a deadly weapon; or
"(b) Uses or attempts to use a dangerous weapon; or
"(c) Causes or attempts to cause serious physical injury to any person.”
ORS 164.405(1) defines robbery in the second degree:
"A person commits the crime of robbery in the second degree if he violates ORS 164.395 and he:
"(a) Represents by word or conduct that he is armed with what purports to be a dangerous or deadly weapon; or
"(b) Is aided by another person actually present.”

This conclusion is consistent with the general rule.
"If it happens that a party who has objected to evidence of a certain fact himself produces evidence from his own witness of the same fact, he has waived his objection. However, when his objection is made and overruled he is required and entitled to treat this ruling as the 'law of the trial’ and to explain or rebut, if he can, the evidence which has come in over his protest. * * *” McCormick, Evidence 128-29, § 55 (2d ed E. Cleary 1972). (Footnotes omitted.)
"If the evidence, though inadmissible, is relevant to the issues and hence probably damaging to the adversary’s case, or though irrelevant is prejudice-arousing to a material degree, and if the adversary has seasonably objected or moved to strike, then the adversary should be entitled to give answering evidence as of right. By objecting he has done his best to save the court from mistake, but his remedy by assigning error to the ruling is not an adequate one. He needs a fair opportunity to win his case at the trial by refuting the damaging evidence. * * *” (Footnotes omitted.) McCormick, Evidence 132-33, § 58 (2d ed E. Cleary 1972).
But see, State v. Unsworth, 240 Or 453, 402 P2d 507 cert den 382 US 1014 (1965), for an apparently contrary ruling in the context of failure to assert subsequently defined constitutional rights.

Lt. Fraser’s testimony may also have been prejudicial in that it apprised the jury that defendant had had a prior encounter with the law and it strongly suggested that defendant was guilty of other uncharged crimes. Because defendant also introduced evidence of his prior confrontations with the law, we need not and do not determine the existence of prejudice in this respect.