**UNITED STATES of America**

**v.**

**GIBBS, Stephen a/k/a "Jake,"**
**Appellant.**

**No. 82–1096.**

United States Court of Appeals,
Third Circuit.

Argued Sept. 14, 1982.

Panel Opinion Filed March 22, 1983.

Vacated and Rehearing En Banc
Granted May 19, 1983.

Reargued In Banc Nov. 21, 1983.

Decided June 15, 1984.

As Amended June 19, 1984.

Martin G. Weinberg (argued), Lillian A. Wilmore, Oteri, Weinberg & Lawson, Boston, Mass., Thomas A. Bergstrom, Philadelphia, Pa., for appellant.

Edward S.G. Dennis, Jr., U.S. Atty., Walter S. Batty, Jr., Asst. U.S. Atty., Chief of Appeals, Robert L. Hickok (argued), Sp. Asst. U.S. Atty., Philadelphia, Pa., for appellee.

Before SEITZ, Chief Judge, ALDISERT, ADAMS, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM, SLOVITER, BECKER, Circuit Judges, and ROSENN, Senior Circuit Judge.

## OPINION OF THE COURT

GARTH, Circuit Judge.

Defendant Stephen Gibbs was convicted after a jury trial in the United States District Court for the Eastern District of Pennsylvania of conspiracy to distribute marijuana in violation of 21 U.S.C. § 846 (1976). The conviction was based primarily on statements made by a co-conspirator, Joseph Quintiliano, that were admitted into evidence against Gibbs under Fed.R.Evid. 801(d)(2)(E), which creates a category of non-hearsay for co-conspirators' admissions.

On appeal to a panel of this court, Gibbs argued that (1) the prerequisites for the admission into evidence of co-conspirator testimony were not satisfied, and that (2) the introduction of that evidence violated his sixth amendment right to confront and cross-examine the witnesses against him. We hold that the challenged testimony was

properly admitted under Fed.R.Evid. 801(d)(2)(E) and we also hold that Gibbs' sixth amendment confrontation issue was not adequately preserved for appeal. Thus, we affirm the judgment of conviction entered below.

## I.

Stephen Gibbs was one of six persons indicted for conspiracy to violate federal narcotics laws.[1] At his trial, Gibbs did not dispute that in 1980 Joseph Quintiliano and several others participated in a conspiracy to import marijuana into the United States with the intent to distribute it for sale. Rather, Gibbs' defense was that there was insufficient evidence of his own participation in the conspiracy.

The existence of the conspiracy was firmly established at trial. The evidence showed that early in 1980, Quintiliano began to make plans to import marijuana into Pennsylvania from Colombia, South America. In late March, he purchased a Beechcraft twin-engine airplane for $40,000. According to the testimony of two unindicted co-conspirators, Charles Bilella and David White,[2] Quintiliano stated on several occasions in late March and early April that he intended to use the airplane to transport marijuana from Colombia into Pennsylvania. From April to September 1980, Quintiliano and the other conspirators made efforts to repair and equip the plane for smuggling. In late September, after several test flights, pilot Prentiss Breland[3] flew the plane from Pennsylvania to Homestead, Florida. On October 4, Breland flew the plane from Florida to Colombia. Upon his return trip to Pennsylvania in the early morning hours of October 5, Breland missed a planned refueling stop in the Bahamas and was forced to land at Boca Raton, Florida, to refuel. A few hours later Breland was arrested at the Florida airport and the plane, containing marijuana worth over $400,000, was seized.[4]

The Government prosecuted Gibbs on the theory that he participated in the conspiracy as the intended purchaser of the marijuana. The evidence linking Gibbs to the conspiracy fell into three categories. First, the Government established that on April 7, 1980, Gibbs traveled from his home in Massachusetts to Quakertown, Pennsylvania, for a meeting with Quintiliano. Gibbs flew to Philadelphia and was met there by David White, who then flew him to meet Quintiliano at Wings Airfield in Montgomery County, Pennsylvania. Surveillance officers testified that Quintiliano greeted Gibbs at Wings Airfield and drove him to the Perkins Pancake House, the site of other conspiracy meetings, where they conversed privately. Quintiliano and Gibbs then proceeded to Quakertown Airport where the Beechcraft was located, and together they inspected the airplane for several minutes. Upon leaving the airport, they were followed by Pennsylvania state

1. Also named in the indictment were Joseph Quintiliano (an alleged co-conspirator), Jerry Quintiliano (Joseph's brother), Prentiss Breland, Michael O'Looney, and Alejandro Rizo. All six defendants were charged in Count I of the indictment with conspiracy to distribute and to possess with the intent to distribute marijuana, in violation of 21 U.S.C. § 846. All of the defendants except Gibbs were also charged with conspiracy to import marijuana unlawfully, in violation of 21 U.S.C. § 963 (Count II) and with the substantive offense of illegal importation of marijuana in violation of 21 U.S.C. § 952 (Count III). Gibbs was tried jointly with codefendant Rizo, who was convicted on two counts of the indictment. The trial of Prentiss Breland was severed, and the other three defendants pleaded guilty to the indictment.

2. Bilella was an aviation insurance broker and Quintiliano's cousin. White, an experienced pilot, was introduced to Quintiliano by Bilella. Throughout the conspiracy, White acted as an informant for the Federal Drug Enforcement Administration (DEA).

3. Prentiss Breland was convicted of violating 21 U.S.C. § 846 (conspiracy to possess with intent to distribute marijuana) and 21 U.S.C. § 963 (conspiracy to import marijuana) and he was sentenced to fifteen years imprisonment on the § 846 count and five years probation on the § 963 count. This court affirmed that judgment and conviction. *United States v. Breland,* 709 F.2d 1490 (3d Cir.1982).

4. DEA Agents were notified by David White, who called from Pennsylvania to alert them that Breland had landed in Florida with drugs.

troopers who observed that the people in the vehicle (Quintiliano and Gibbs) were looking around to see if someone was following them and that Quintiliano engaged in several driving maneuvers that the officers testified were designed to evade surveillance, i.e., a brief pull-off into a hotel area, followed by a resumption of travel in the same direction, and then, after further "looks" by the driver and passenger, a U-turn to proceed in the direction from which they had come.

The second category of evidence upon which the Government relied, and in fact the principal evidence offered against Gibbs, was derived from statements made by Quintiliano that implicated Gibbs in the conspiracy. Bilella and White testified that in the spring of 1980, around the time Quintiliano purchased the Beechcraft and began to repair it, Quintiliano stated that he planned to sell the marijuana to a customer named "Jake" with whom he had dealt before. On April 6, 1980, the day before Gibbs' visit to the Quakertown airport, Quintiliano told White that "Jake" was growing impatient with the slow progress of the planning, and that Quintiliano had invited "Jake" to come for a visit the next day (*i.e.*, April 7, 1980) to see firsthand the preparations for the Colombia trip. White volunteered to meet "Jake" at the Philadelphia airport and to take him to Wings Airfield to meet with Quintiliano. White testified that the following day he went to Philadelphia and met defendant Gibbs, who identified himself as "Jake" and matched the description of "Jake" given by Quintiliano. Gibbs told White that he had been informed of the arrangements for White to meet him in Philadelphia.

Bilella also testified to an out-of-court statement by Quintiliano. According to Bilella, sometime during the first week in October, Quintiliano told him that he had made arrangements to sell the marijuana to some people from Florida who had offered more money than "Jake." (Gibbs argues that this testimony indicates that he, Gibbs, had dropped out of the conspiracy.)

White and Bilella also testified to a series of events that took place at Quintiliano's home on the evening of October 4, 1980, including statements by Quintiliano concerning telephone conversations that incriminated Gibbs in the conspiracy. Bilella testified that while he was in Quintiliano's home early that evening, he heard Rizo and Quintiliano discussing financial arrangements for the sale of the marijuana to the people from Florida, who were staying nearby. Quintiliano apparently became dissatisfied with these terms because the prospective buyers were unable to pay cash in advance. Quintiliano stated that he had telephoned "Jake" to see if he would buy the marijuana, and that "Jake" had agreed to "try to make the necessary arrangements." [5]

White testified that while at his own home that evening, he received a telephone call from Quintiliano asking him to come to Quintiliano's residence. When White arrived about 10:45 p.m., Quintiliano apprised him of the developments earlier in the evening. Quintiliano described to White three telephone conversations he had had with his Miami bosses, who had instructed Quintiliano not to distribute the marijuana without receiving full payment. [6] White also testified regarding Quintiliano's account of a telephone call to "Jake" in which "Jake" reportedly had agreed to buy the marijuana but needed time to obtain the necessary

---

**5.** Q: What did he [Quintiliano] say about "Jake" to you that evening?
A: He said he had called. He went to another room and said he had called up "Jake" and asked him if he could perhaps make arrangements to have someone come down and pick up this load.
Q: Did he tell you whether he had reached "Jake" to speak to him?

A: He had spoken to him, yes.
Q: And did he tell you what "Jake's" response to him was?
A: That he would try to make the necessary arrangements, yes.
App. 273a (Bilella on Direct Examination).

**6.** The telephone records show that Quintiliano made one call to Florida at 10:52 p.m.

funds.[7] These conversations between White and Quintiliano took place in Rizo's presence. White further testified that he heard Quintiliano instruct his brother Jerry to call "Jake" from a pay phone. Quintiliano asked White for permission to store the marijuana temporarily in his shop until "Jake" could get the money, and at about 12:30 a.m. on October 5, 1980, White, Quintiliano, and other conspirators met at White's shop to clear storage space for the marijuana.

The third category of evidence by which the Government sought to link Gibbs to the conspiracy and to corroborate the co-conspirator testimony consisted of telephone records showing long distance calls made from the Quintiliano residence in Pennsylvania. At least six telephone calls were made from Quintiliano's residence to the Gibbs residence in Massachusetts between March and May 1980.[8] Four such calls were made during September 1980, three of which occurred on September 26–27, about the time Breland flew the plane to Florida. Another call was made on October 3, 1980, the day before the plane left for Colombia. In addition, two calls were made from the Quintiliano residence to the Gibbs residence in the early morning hours of October 5, at the time the plane was due in Quakertown. The second such call, made at 3:39 a.m., followed a call from Quintiliano to David White, who was waiting at Quakertown Airport, in which Quintiliano told White that something had gone wrong with Breland's flight home.

There also was evidence of telephone calls on October 4, 1980, from Quintiliano's residence to the Ram Broadcast Co. (Ram), an electronic beeper service located near Gibbs' home in Massachusetts.[9] Although there was no direct evidence that the defendant was a client of Ram, the Government did demonstrate that one of Ram's customers was a "Gibbs Oil Co." and that Gibbs himself had claimed to be involved in the oil business. There was no evidence that these calls to Ram were returned.

On appeal, Gibbs contends that the district court erred in allowing the jury to consider the statements made by Quintiliano to White and Bilella as evidence against Gibbs. He maintains that Quintiliano's out-of-court statements were hearsay declarations that should have been excluded from admission under the Federal Rules of Evidence and under the Confrontation Clause of the sixth amendment to the Constitution.

## II.

Under the Federal Rules of Evidence, the out-of-court statements of a party to the case or of his agent are considered "admissions"—non-hearsay [10]—and may be used as substantive evidence. See Fed.R.Evid. 801(d)(2). Rule 801(d)(2)(E) provides that statements offered against a party that are made "by a co-conspirator of a party during the course and in furtherance of the conspiracy" are not hearsay and are admissible. In this case, the district court found

---

7. Q: Were other telephone calls made that evening?
   A: Joe made a call to a—gentleman named "Jake" in—in the Boston or Massachusetts area to see if he would buy the—marijuana.
   Q: And after that telephone call, what did Joe say about the call?
   A: Joe told me that "Jake" would buy the marijuana. He only could—could that night—he only had a hundred thousand dollars cash on hand. We—he would be able to get the rest of the money in a day or when the banks opened.
   App. 109a (White on Direct Examination).

8. The evidence documents five calls in March and one in May 1980. The Government offered no records for the month of April.

9. The first such telephone call was made early in the morning of October 4. A call was also made that night at 8:52 p.m., and at 10:21 p.m., a call to Ram was placed from a pay telephone near Quintiliano's home and charged to the Quintiliano residence.

10. Technically, the federal rules exclude admissions from the definition of hearsay rather than treating them as exceptions to the rule against hearsay. See United States v. Ammar, 714 F.2d 238, 255 (3d Cir.), cert. denied, — U.S. —, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983). For simplicity, we will refer to the "co-conspirator exception."

that Quintiliano's out-of-court statements were admissible against Gibbs as co-conspirator admissions.

■ Before an out-of-court statement can be admitted into evidence under Fed.R. Evid. 801(d)(2)(E), three requirements must be satisfied. *United States v. Ammar,* 714 F.2d 238, 245 (3d cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983). First, there must be independent evidence establishing that the person against whom the statement is offered participated in the conspiracy. Second, the statement must have been in furtherance of the conspiracy. · Third, the co-conspirator's statement must have been made during the life of the conspiracy. Gibbs contends that the first and second prerequisites are not met in this case.

### A. *Independent Evidence of Conspiracy*

■ According to the rule of *United States v. Trotter,* 529 F.2d 806 (3d Cir. 1976), the prosecution must lay a foundation for the admission of co-conspirator testimony by establishing the existence of a conspiracy including the defendant by "a fair preponderance of independent evidence." *Id.* at 811–13. *See Ammar,* 714 F.2d at 246 & n. 3.; *Government of the Virgin Islands v. Dowling,* 633 F.2d 660, 665 (3d Cir.), *cert. denied,* 449 U.S. 960, 101 S.Ct. 374, 66 L.Ed.2d 228 (1980); *United States v. Continental Group, Inc.,* 603 F.2d 444, 457 (3d Cir.1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980).[11] This preponderance standard simply requires the prosecution to present sufficient proof so that the trial judge may find "that the existence of the contested fact is more probable than its nonexistence." *Trotter, supra,* 529 F.2d at 812 n. 8 (quoting McCormick, *Evidence* 794 (2d ed. 1972)).[12] In reviewing the district court's determination that a preponderance of independent evidence established Gibbs' participation in the conspiracy, this court's inquiry is limited to whether the trial judge had "reasonable grounds" to make his finding. *Ammar,* 714 F.2d at 249; *Continental Group,* 603 F.2d at 460; *United States v. Bey,* 437 F.2d 188, 196 (3d Cir.1971).

■ In holding that the district court did not err in finding that the conspiracy existed and that Gibbs participated in the conspiracy we do not consider the alleged telephone conversations between Quintiliano and Gibbs to which White and Bilella testified.[13] The existence of a conspiracy in this case is clear and uncontested. As for Gibbs' participation in the conspiracy, the independent evidence (*i.e.,* evidence apart from the testimony of White and Bilella) offered by the Government to prove that Gibbs was a member of the conspiracy, while not weighty, was nevertheless sufficient. The ·Government relied heavily on Gibbs' visit to Pennsylvania in April 1980 and on telephone records showing calls made from Quintiliano's residence to Gibbs' residence or Ram Broadcast Co. around the time of the unsuccessful smuggling operation.

---

11. Other courts have also adopted this rule. *See, e.g., United States v. Andrews,* 585 F.2d 961 (10th Cir.1978); *United States v. Santiago,* 582 F.2d 1128 (7th Cir.1978); *United States v. Enright,* 579 F.2d 980 (6th Cir.1978); *United States v. Bell,* 573 F.2d 1040 (8th Cir.1978); *United States v. Stanchich,* 550 F.2d 1294 (2d Cir.1977); *United States v. Jones,* 542 F.2d 186 (4th Cir.), *cert. denied,* 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375, 376 (1976). *But see United States v. Bulman,* 667 F.2d 1374, 1377–79 (11th Cir.), *cert. denied,* 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982) (adopting Fifth Circuit precedent of "substantial independent evidence" test); *United States v. Slade,* 627 F.2d 293, 307 (D.C.Cir.1980) (same test); *United States v. James,* 590 F.2d 575 (5th Cir.) (en banc) (same test), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).

12. In *Trotter,* this court refused to accept the Government's suggestion that a less rigorous standard requiring only "prima facie proof" was appropriate in light of *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). ·

13. Once Gibbs was held to have participated in the conspiracy the telephone conversations referred to in text were properly admissible against Gibbs under Fed.R.Evid. ·801(d)(2)(E). *See Ammar,* 714 F.2d at 245.

The circumstances surrounding Gibbs' April 7, 1980, visit to see Quintiliano, the principal conspirator, provides some evidence that Gibbs was involved in Quintiliano's scheme at that time. The meeting took place only nine days after Quintiliano bought an airplane to be used for smuggling marijuana into the United States, and it took Gibbs a considerable distance from home to the place of the conspiratorial planning. Gibbs and Quintiliano had obviously had some communication prior to the visit. Although the plane was located at Quakertown Airport, White was instructed by Quintiliano to take Gibbs to Wings Airfield,[14] from which the Government suggests an inference can be drawn that Gibbs and Quintiliano wanted to hide their connection with the smuggling plane located at Quakertown Airport.[15] Gibbs and Quintiliano conferred at the Perkins Pancake House, the site of previous conversations between Quintiliano and White and Bilella concerning the conspiracy. The defendant and Quintiliano then proceeded to Quakertown Airport, where they inspected the plane to be used in the smuggling operation. Finally, evidence of Quintiliano's evasive driving after leaving Quakertown Airport accompanied by his passenger Gibbs, and the frequent glances by both Quintiliano and Gibbs for the apparent purpose of detecting surveillance allows the further inference of unlawful activity. *See United States v. D'Amato,* 493 F.2d 359, 364–65 (2d Cir.), *cert. denied,* 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 50 (1974) (counter-surveillance driving indicative of conspiracy).

We recognize that at that point in the trial the evidence of Gibbs' contacts with Quintiliano may have fallen short of establishing Gibbs' involvement in the conspiracy beyond a reasonable doubt. But that is not the appropriate standard to be applied at that stage. The evidence, as recounted above, permits a reasonable inference of Gibbs' complicity in the enterprise then under way. We cannot say that the district court lacked reasonable grounds to infer that Gibbs was participating in the conspiracy at the time of his visit.[16]

Because most of the co-conspirator declarations offered by the Government were made six months after Gibbs' April 7, 1980, visit to Pennsylvania, we must consider whether there was sufficient independent evidence from which the district court reasonably could have inferred that Gibbs was still involved in the conspiracy in October 1980. The Government, in seeking to demonstrate the necessary predicate for admission of Quintiliano's co-conspirator declarations, relied on a presumption that Gibbs' membership in the conspiracy continued until October 1980.[17]

---

**14.** White testified on direct examination that he "volunteered to go down and pick up 'Jake' with my—with an airplane, and Joe accepted the—the offer, ... and the next day I went down to the airport and met—met 'Jake'." App. 61a. This testimony would be admissible against Gibbs to link him to the conspiracy without running afoul of the hearsay rules.

**15.** The defendant argued before this court, based on the record, that Gibbs was taken to Wings Airfield because it was convenient to Quintiliano's residence. Accepting that as true does not alter the fact that a reasonable inference such as the Government suggests could be drawn from the circumstances described. At this point in time, the Government is entitled to the benefit of any reasonable inferences that may be drawn from the record. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1941).

**16.** It is true that mere association with those who have conspired cannot by itself support a conviction for conspiracy. *See Ammar,* 714 F.2d at 250; *United States v. Torres,* 519 F.2d 723, 726 (2d Cir.), *cert. denied,* 423 U.S. 1019, 96 S.Ct. 457, 46 L.Ed.2d 392 (1975). In the instant case, however, inferences are capable of being drawn which suggest that Gibbs' meeting with Quintiliano was "intended to advance the ends of the conspiracy." *See United States v. Mancillas,* 580 F.2d 1301, 1308 (7th Cir.), *cert. denied,* 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978). In addition, it must be remembered that the Government's burden here was only to establish the existence of a conspiracy by a preponderance of the evidence.

**17.** Direct evidence of Gibbs' relationship to Quintiliano in October 1980 consists of telephone records showing calls from the Quintiliano residence to the Gibbs residence or to Ram Broadcast Co. at around that time. The Government suggests that from this series of telephone calls it can be inferred that Gibbs and Quintiliano were discussing arrangements for the sale

This court has held that once the Government establishes a defendant's involvement in an ongoing conspiracy, the burden shifts to the defendant to prove by affirmative acts inconsistent with the object of the conspiracy that he withdrew.[18] *Ammar,* 714 F.2d at 254; *United States v. Steele,* 685 F.2d 793, 803–04 (3d Cir.1982), *cert. denied,* 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1983); *United States v. Gillen,* 599 F.2d 541, 548 (3d Cir.), *cert. denied,* 444 U.S. 866, 100 S.Ct. 137, 62 L.Ed.2d 89 (1979).[19] Because there is no evidence that Gibbs withdrew from the conspiracy after April, his involvement may be deemed to have continued until October,[20] making him a conspirator at the time of Quintiliano's incriminating statements to White and Bilella on October 4 and 5, 1980. Therefore, we conclude that the district court did not err in its determination that the Government met its burden of establishing by a preponderance of independent evidence that Gibbs was involved in the conspiracy at the time of Quintiliano's statements.

### B. *"In Furtherance"* of the Conspiracy

Gibbs argues that the Government did not satisfy the requirement of Fed.R.Evid. 801(d)(2)(E) that the statements be made *in furtherance* of the conspiracy. Gibbs claims that Quintiliano's statements to White and Bilella were mere "narratives of past fact" and not made to induce conduct that would further the goals of the conspiracy, and that White and Bilella were mere "errand runners."

Gibbs' argument is meritless. The "in furtherance" requirement is usually given a broad interpretation. *See United States v. Trotter, supra,* 529 F.2d at 813. It is true that statements made to those who are not involved in the conspiracy are not "in furtherance" of it, *United States v. Provenzano,* 620 F.2d 985, 1000–01 (3d Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980), just as casual conversation between co-conspirators that is not intended to induce continued involvement, or other actions that would not advance the conspiracy, are not "in furtherance" of a conspiracy. *See, e.g., United States v. Lieberman,* 637 F.2d 95, 103 (2d Cir.1980); *United States v. Eubanks,* 591 F.2d 513, 520–21 (9th Cir.1979). But statements made by one conspirator to keep other conspirators informed about the progress of the scheme do satisfy the "in furtherance" requirement. *See, e.g., Ammar,* 714 F.2d at 252; *United States v. Pool,* 660 F.2d 547, 562 (5th Cir.1981);

---

of the marijuana in furtherance of whatever plans they had made at their April meeting. Gibbs argues otherwise. He claims that one obvious difficulty is the absence of evidence directly linking Gibbs with Ram or showing that any of Quintiliano's calls were returned. Moreover, Gibbs asserts that except for Quintiliano's hearsay, there is nothing to indicate the substance of the conversations, and the bare bone telephone toll records have little probative value.

**18.** Defendants can also show "that the conspiracy terminated, such as by demonstrating that its ends had been so frustrated or its means so impaired that its continuation was no longer plausible." *Ammar,* 714 F.2d at 254. There is no doubt in this case but that the drug smuggling conspiracy itself had not been terminated and was ongoing in October 1980.

**19.** Gibbs claims the presumption of continuing involvement under *Gillen* is unconstitutional, citing *United States v. Read,* 658 F.2d 1225 (7th

Cir.1981). *Read,* however, concerns the prosecution's burden to prove every element of the offense beyond a reasonable doubt as a basis for a conviction and thus is not relevant to the lesser showing that must be made to permit the introduction of co-conspirator statements. Moreover, *Read* did impose on the defendant the burden of presenting *some* evidence of withdrawal. *Id.* at 1239. Here none was presented.

**20.** Although Gibbs challenged the admissibility of Quintiliano's out-of-court statements and at the conclusion of the trial moved "to strike all of the hearsay coconspirator's declarations," on appeal Gibbs argues in support of his claim (that he had withdrawn from the conspiracy) that an alleged statement by Quintiliano to Bilella early in October 1980—to the effect that Quintiliano had another potential buyer from Florida for the marijuana—is evidence that Gibbs had withdrawn from the conspiracy as early as April. This testimony, however, is a portion of the very evidence to which Gibbs objects.

*United States v. Mason,* 658 F.2d 1263, 1270 (9th Cir.1981).

In the present case, there was a reasonable basis for the trial court to find that Quintiliano's statements to Bilella and White were made in furtherance of the conspiracy. As participants in the scheme, it was important for White and Bilella to be kept abreast of developments to induce their continued participation and allay any fear they might have had. Although neither White nor Bilella had any decision-making role or any real interest in the identity of the buyer, they both had been closely involved in the planning and implementation of the conspiracy. White had picked up Gibbs at the Philadelphia Airport and brought him to the conference rendezvous with Quintiliano in April, and had also agreed to help unload the marijuana when the plane arrived. Quintiliano, who specifically had asked White to come to his home for a talk, may have foreseen that he would be requesting White's cooperation in storing the marijuana temporarily. Although Bilella at that time had no specific duties with respect to the conspiracy, he had repeatedly rendered assistance to Quintiliano; he had at Quintiliano's request found the Beechcraft plane for purchase and had introduced him to White, an experienced pilot. Quintiliano also may have felt that he would need Bilella's help in the future. Under these circumstances, Quintiliano's reports to White and Bilella did further the conspiratorial scheme.

This case is distinguishable from *United States v. Provenzano, supra,* where the co-conspirator's statements were held not to be in furtherance of the conspiracy. Contrary to the circumstances of the instant case where all the statements were made to co-conspirators, in *Provenzano,* the statements were made to persons *not* part of the conspiracy who had no reason to know about the matters disclosed to them.

We conclude that the Government satisfied its burden of laying the necessary foundation for admission of Quintiliano's co-conspirator statements against Gibbs under Fed.R.Evid. 801(d)(2)(E). It remains for us to consider Gibbs' contention that his constitutional rights under the sixth amendment Confrontation Clause were violated.

### III.

The sixth amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." Gibbs contends on appeal that the admission of out-of-court statements made by Quintiliano on October 4 and 5, 1980, had the effect of denying Gibbs his constitutional right to confront and cross-examine his accuser. Gibbs argues that under the rule of *Ohio v. Roberts,* 448 U.S. 56, 65–66, 100 S.Ct. 2531, 2538–39, 65 L.Ed.2d 597 (1980), which examined the bounds of the sixth amendment, the Government was required to prove that the declarant, Quintiliano, was unavailable, and that the co-conspirator evidence was reliable,[21] before any such testimony could be admitted into evidence.

---

**21.** The only argument made by Gibbs challenging the reliability of the evidence is that Quintiliano had reason to, and did, fabricate Gibbs' involvement in the conspiracy. In *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Supreme Court held that "the Confrontation Clause restricts the range of admissible hearsay by imposing a two-prong requirement: first, the government must normally show that the declarant is unavailable and that the hearsay testimony is thus necessary; and second, the statement must bear sufficient 'indicia of reliability' to demonstrate its trustworthiness." *United States v. Ammar,* 714 F.2d 238, 255 (3d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983), citing *Roberts,* 448 U.S. at 65–66, 100 S.Ct. at 2538–39. Some members of the majority believe that the reliability component of the *Roberts* test should be addressed in this opinion, while others do not. *See United States v. Ammar,* 714 F.2d 238, 254–57 (3d Cir.1983) (decided after Gibbs' trial). Regardless of that philosophical disagreement, all the members of the majority are in agreement that the *Roberts* reliability requirement, if preserved for appeal, was satisfied in this case. *See Ammar,* 714 F.2d at 256 ("[I]n many, if not most, instances a coconspirator statement which is admissible under Rule 801(d)(2)(E) will also be sufficiently reliable to satisfy the Confrontation Clause."). In short, we are not persuaded by Gibbs' reliability argument.

We recognize that no exact equation exists between Fed.R.Evid. 801 and the Confrontation Clause, *see Dutton v. Evans*, 400 U.S. 74, 86, 91 S.Ct. 210, 218, 27 L.Ed.2d 213 (1970); *Ammar*, 714 F.2d at 254–55, thereby raising the possibility that evidence that satisfies Fed.R.Evid. 801(d)(2)(E) could still be deemed inadmissible under the constitutional test. Gibbs has argued that unavailability must be demonstrated and that the Government has the burden of establishing unavailability. However, we have no occasion to discuss or to reach the merits of that issue in this case, *i.e.*, whether unavailability must be shown to satisfy the Confrontation Clause where a co-conspirator statement is sought to be admitted. Even if we were to assume that unavailability had to be demonstrated, Gibbs did not preserve that question for appeal.

■ The Confrontation Clause issue now raised by Gibbs—*i.e.*, that the Government did not carry its burden of proof as to unavailability and reliability of the evidence (*see* note 21 *supra*)—was never raised by Gibbs during trial. Had Gibbs, by a specific objection, timely made, alerted the Government and the district court to the fact that no proof of unavailability had been presented by the Government, that deficiency could have been cured. But because Gibbs did not preserve that issue for appeal, it cannot serve now as a basis to reverse Gibbs' conviction.

### A.

The evidence against Gibbs, the ostensible purchaser in a conspiracy to import and distribute a large quantity of marijuana, consisted in significant part of the testimony of Bilella and White, two unindicted co-conspirators, who testified to a number of hearsay declarations by Quintiliano (the alleged chief conspirator, who did not testify at trial) to the effect that Quintiliano planned to sell the marijuana to a customer named "Jake" (Gibbs).

At no time during the Government's case-in-chief, however, did Gibbs object to any of Quintiliano's hearsay declarations on Confrontation Clause grounds. Rather, Gibbs' counsel asserted that under the co-conspirator rule, Fed.R.Evid. 801(d)(2)(E), Quintiliano's out-of-court declarations were inadmissible because the Government had not established, by independent evidence, either the existence of a conspiracy or Gibbs' involvement in the conspiracy. During White's testimony, for example, the following exchange transpired:

Q. Mr. White, did Joseph Quintiliano ever mention to you potential buyers for the marijuana?

MR. BERGSTROM: Objection.

It is hearsay, Your Honor, and there is no proof aliunde of a conspiracy at this point in the case.

THE COURT: Well, that we do not find persuasive.

We will permit the question.

App. at 43a. Counsel later obtained a standing objection to White's repetition of Quintiliano's out-of-court declarations. *Id.* at 55a.

Similarly, during Bilella's testimony the following exchange took place:

Q. Now, you mentioned someone by the name of "Jake."

Who was it that told you about "Jake"?

A. Well, Joe had mentioned a fellow named—

MR. BERGSTROM: Objection—it is hearsay, Your Honor, for the record, sir.

THE COURT: Your response, Mr. Huyett.

MR. HUYETT: Yes, sir.

It is a co-conspirator statement.

THE COURT: Yes.

The witness may [answer] the question if he understands it.

App. 248a.

At this juncture, Gibbs did not question, and consequently the Government had no obligation to answer, whether the introduction of Quintiliano's declarations would violate the Confrontation Clause—much less that the Confrontation Clause would require a showing of unavailability. Thus, it is not surprising that the question of who bore the burden of establishing Quintili-

ano's unavailability, and the concomitant factual question as to whether Quintiliano was unavailable, never arose. Certainly Gibbs never raised any such issue. And because Rule 801 [22]—unlike Fed.R.Evid. 804 [23]—does not require a showing of unavailability, the subject of Quintiliano's availability never became an issue, and thus never became part of the record.

On November 27, 1981, the Government rested. App. 442a. Gibbs then moved, pursuant to Fed.R.Crim.P. 29(a), for a judgment of acquittal. At the same time, counsel for Gibbs stated that "it would probably be necessary for me also to make a motion to the Court to ... strike all of the hearsay co-conspirator declarations from the record." App. 448a. Gibbs renewed at this stage the argument, raised in his Memorandum of Law and by his trial objections referring to Fed.R.Evid. 801, that the Government failed to establish "a conspiracy by a clear preponderance of the evidence independent of the co-conspirator statement and the participation of the defendant, Gibbs, in that conspiracy ...." *Id.*

In addition, for the first time Gibbs observed "yet another problem." App. 452a. "Aside from [Rule] 801(d)(2)(E)," Gibbs argued, "there is a clear Sixth Amendment problem in this case." *Id.* Noting that the co-conspirator hearsay rule "does not subsume and take the place of the Sixth Amendment right to confrontation," Gibbs asserted that the "Sixth Amendment right and Rule 801(d)(2) are going to come smashing head on into one another ... in this case." *Id.* at 452a–53a. The essence of Gibbs' sixth amendment objection is captured by the following passage:

> The [men] who should have been on that witness stand and whom I should have been able to cross-examine [were] Joe Quintiliano [and his brother] Jerry Quintiliano, the declarant[s] of the hear-

say statement[s], and I have been denied through this case the right to confront and cross-examin[e] [those] who really are the ultimate accusers in this case ... —that being Joseph and Jerry Quintiliano.

App. 453a.

At no time during these remarks, however, did Gibbs assert that Quintiliano was in fact available, or that the Government had the burden of showing unavailability and had not carried this burden. As a consequence, neither the Government nor the district court was alerted to the nature of the issue upon which Gibbs now seeks to have his conviction reversed.

Had anyone mentioned the word "availability," of course, it would have been a relatively simple matter for the Government to address that question and produce proofs as to Quintiliano's availability or unavailability. Presumably the Government could have called Quintiliano, and if Quintiliano had asserted the fifth amendment privilege against self-incrimination, he then would have been deemed unavailable. *See United States v. Pelton*, 578 F.2d 701, 709–10 (8th Cir.1978). Hence, it is solely by reason of Gibbs' failure to raise the issue of Quintiliano's availability before the district court, that the record is barren of any evidence of Quintiliano's unavailability.

The district court denied Gibbs' motion to strike and motion for judgment of acquittal without comment on Gibbs' general constitutional objection. The court found only that "the Government has established the existence of an alleged conspiracy and the connection of each defendant with it by a clear preponderance of the evidence independent of the hearsay declarations." App. at 480a. The defense rested immedi-

---

**22.** Rule 801(d)(2)(E) states only that "[a] statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."

**23.** Rule 804(b) lists five hearsay exceptions which "are not excluded by the hearsay rule if the declarant is unavailable as a witness," using the definition of "unavailable" found in Rule 804(a) (listing five categories of when a witness is to be deemed unavailable).

ately thereafter. Gibbs' conviction followed.

### B.

■ There are compelling reasons why Gibbs' Confrontation Clause objection—even if it had been specifically made, and even if it had addressed the issues of burden of proof and unavailability, which it did not—should be regarded as untimely.

First, Fed.R.Evid. 103(a)(1) requires that a timely objection or motion to strike must "stat[e] the specific ground of objection, if the specific ground was not apparent from the context." Gibbs can hardly argue that the issue of the Government's failure to establish Quintiliano's unavailability—an argument that eluded the Government and the district court—was "apparent from the context." It follows that Gibbs was obliged to satisfy the specificity requirement of Rule 103.

The Advisory Committee Notes to Rule 103 indicate that the purpose of the specificity requirement is to call the nature of the error "to the attention of the judge, so as to alert him to the proper course of action and enable opposing counsel to take proper corrective measures." Rule 103(a) Advisory Comm. Note. Gibbs' objection is the model of an objection that fails the Advisory Committee's test. At no time was the district court ever apprised that the nub of Gibbs' complaint was that the Government had not proved Quintiliano's unavailability. As a consequence, the Government was deprived of the opportunity to take corrective measures—including the possibility of calling Quintiliano in order to establish that he would assert the fifth amendment privilege.

Second, even assuming that Gibbs' objection was sufficiently specific, Gibbs made his constitutional objection *not* when the evidence was offered, but during a motion to strike made *after* the Government rested. As a consequence, the many co-conspirator declarations related by White and Bilella over the course of a three-day trial were already in evidence.

As Professors Wright and Graham note, the appropriate time for raising an objection is as soon as the ground for objection is known, or could reasonably have been known to the objector—unless some special reason makes its postponement desirable and not unfair to the opposition. 21 C. Wright & K. Graham, Federal Practice and Procedure § 5037, at 188 (1977). Nothing prevented Gibbs' counsel from raising an objection when White first testified. Gibbs could have objected to the following effect: "Your Honor, although Rule 801 does not require that the declarant be unavailable, the Confrontation Clause does. Because there is no evidence that Quintiliano is unavailable, the evidence is inadmissible."

This simple objection, if made when the Government sought to introduce the testimony of White and Bilella, would have warned the Government of the need to call Quintiliano, or to prove his unavailability in other ways. No special reasons made a postponement of this objection desirable, and a good many reasons made its postponement unfair. Not the least of these reasons is that the Government would have been obliged to reopen its case in order to establish Quintiliano's unavailability—a matter which, from his silence at trial, we can only assume Gibbs had taken for granted.

If Quintiliano ultimately proved to be unavailable, a delay of several days might have resulted until the Government produced him—a delay that could have been obviated had Gibbs' constitutional objection been made during the trial, when it would have been timely, rather than after the evidence had closed. Even at that late date, an issue raised as to unavailability could still have been met by the Government. If, however, Quintiliano had proved to be "available"—perhaps because he would choose not to assert his fifth amendment privilege—Gibbs' motion to strike, if granted, would almost certainly have been followed by a motion for mistrial on the ground that no jurors could be expected to expunge from their minds the many hearsay declarations adduced throughout three days of prior testimony.

This court has frequently held that it will not entertain arguments on appeal based on objections not timely raised below. *See Halderman v. Pennhurst State School & Hospital,* 673 F.2d 628, 639 (3d Cir.1982) (in banc), *reversed on other grounds,* —— U.S. ——, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Caisson Corp. v. Ingersoll-Rand Co.,* 622 F.2d 672, 680 (3d Cir.1980). To do so here would constitute an unacceptable interference with the administration of justice and the district court's management of the trial. We reverse the trial judge's determination of timeliness only for an abuse of discretion.[24] The circumstances here do not rise to that level. For these reasons, we hold Gibbs' objection untimely[25] and insufficient to preserve a Confrontation Clause "unavailability" issue for appeal.

### V.

As we have discussed, we are satisfied that there was sufficient evidence to withstand Gibbs' 801(d)(2)(E) objection, which had been properly taken. Gibbs, however, did not preserve in timely fashion the Confrontation Clause issue which he has raised on appeal. His failure to alert the Government or the court to the issue of Quintiliano's unavailability precludes our consideration of Gibbs' argument which involves, among other things, the Government's failure to carry its sixth amendment burden of proof. Having failed to preserve this issue at the threshold, there is no need for us to address the merits of his sixth amendment argument.

We will affirm Gibbs' conviction.

ROSENN, Senior Circuit Judge, with whom ALDISERT and GIBBONS, Circuit Judges, join, dissenting.

Beginning with the defendant's brief and only appearance in Quakertown, Pennsylvania, the Government's case against him is built upon speculative inferences, legal fiction, and double hearsay. These are joined by the fragile tissue of a judicial presumption that, once a defendant has been found to have participated in a conspiracy, he is presumed to continue to participate in it despite the lapse of considerable time, unless he produces affirmative evidence that he has withdrawn.

The Government's case is grounded on meager testimony—barely sufficient under the preponderance. of evidence rule of this circuit—offered as independent evidence of defendant's participation in the marijuana conspiracy[1] as a potential buyer. On the

---

**24.** In *Belmont Industries, Inc. v. Bethlehem Steel Corp.,* 512 F.2d 434 (3d Cir.1975), testimony had been received without objection "at widely scattered times over [a] ten-day trial." *Id.* at 437. Belmont moved after the close of Bethlehem's case to strike considerable portions of testimony on hearsay and best-evidence grounds. In addition, like Gibbs, Belmont's motion did not specify which of the items of testimony were to be stricken. *Id.* This court held:

> We cannot say that the trial judge abused his discretion in determining that the possibilities of confusion to the jury, prejudice to the opposing party, and undue delay of a case about to be submitted to the jury outweighed the detriment suffered by Belmont resulting from the reception of this allegedly hearsay and secondary evidence.

*Id.* (footnote omitted).

The circumstances in *Belmont Industries* apply with equal force here. Certainly the prospects of confusion to the jury, prejudice to the Government, and undue delay are very real in this case, particularly since here Gibbs at no time made known the specific constitutional ground on which he now relies.

**25.** Although we may entertain on appeal objections not timely raised below if the district court committed plain error, *see* Fed.R.Crim.Proc. 52(b); *Halderman, supra,* 673 F.2d at 639–40, we are satisfied that in this instance the district court did not commit plain error.

**1.** Judge Aldisert and Judge Gibbons believe that there was insufficient evidence of conspiracy measured by the "fair preponderance of independent evidence" test of *United States v. Trotter,* 529 F.2d 806, 811–12 (3d Cir.1976). *See also Edward J. Sweeney & Sons, Inc. v. Texaco,* 637 F.2d 105, 115–17 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981).

Several other circuits have adopted a more stringent test than the preponderance of evidence rule for the admission of coconspirator statements. They require "substantial evidence," independent of the statements, showing the defendant's participation in the conspiracy. *United States v. Bulman,* 667 F.2d 1374, 1379 (11th Cir.), *cert. denied,* 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982); *United States v. Jackson,* 627 F.2d 1198, 1219 (D.C.Cir.1980); *United States v. Grassi,* 616 F.2d 1295, 1300–01

basis of this slight, inferential, and dubious evidence the Government introduced the out-of-court hearsay declarations. To accomplish this objective the Government leaned heavily on the coconspirator rule, which is based on the legal fiction that each conspirator is the agent of the other. It has neither produced the declarant for cross-examination nor has it shown that he is unavailable. Also absent is not only direct or circumstantial evidence of guilt, but the procedural opportunity for fairness and the discovery of truth. The accused has been denied the fundamental right to cross-examine the out-of-court declarant. A society that values the good name and liberty of every person should not condemn anyone on such a naked amalgam of double hearsay, legal fiction, and judicial presumption. I therefore dissent.

## I.

No one disputes the existence of the 1980 conspiracy among the two Quintiliano brothers and others to smuggle marijuana into Pennsylvania from Colombia, South America, and to distribute it. As the majority correctly observes, op. at 840, the Government prosecuted Gibbs on the theory that he too participated in the conspiracy as the potential purchaser. To prove his participation, the Government established that on April 7, 1980, Gibbs flew to Wings Air Field in Montgomery County, Pennsylvania, where Joseph Quintiliano [2] met him. They then traveled to the Quakertown Airport, where they inspected for several minutes the Beechcraft airplane purchased several weeks previously by Quintiliano to smuggle the marijuana from Colombia.

At this point, there may have been several legitimate reasons why Gibbs was in Quakertown. State police officers, however, gave it a criminal conspiratorial flavor by testifying that they observed Quintiliano, upon leaving the Quakertown Air-

port, engage in what they considered evasive driving to avoid surveillance.

Based upon this tenuous evidence of Gibbs's complicity in the conspiracy, the Government introduced out-of-court statements allegedly made by Quintiliano to Bilella and White, unindicted coconspirators, of what Gibbs allegedly told Quintiliano.[3] These out-of-court statements, which the majority acknowledges were the principal evidence offered against Gibbs, op. at 841, became the fulcrum of the Government's case and were essential to convict Gibbs. The Government never called Quintiliano, but instead produced Bilella and White, who testified that about the time Quintiliano purchased the Beechcraft airplane he told them that he planned to sell the imported marijuana to a customer named "Jake." White testified that Gibbs, whom he had met when Gibbs came to inspect the plane at Quakertown, matched Quintiliano's description of "Jake" and had identified himself to White under that name.

The crux of the Government's case depends upon the out-of-court statements made on the evening of October 4, 1980, at Quintiliano's home. These statements allegedly (op. at 841–842) made by Gibbs alluded to Quintiliano's reopening of negotiations with him in early October 1980 after Quintiliano had rejected some Florida prospects for the purchase. They were introduced in evidence through Bilella's and White's testimony. Quintiliano told them that he had telephoned "Jake" when he rejected the prospective Florida purchasers and that "Jake" told him that he would "try to make the necessary arrangements" for the purchase.

In an effort to give some credence to the hearsay testimony, the Government introduced evidence of certain telephone records. They showed that long distance calls were made early in October 1980 from

---

(5th Cir.1980); *United States v. Petersen,* 611 F.2d 1313, 1330–31 (10th Cir.1979).

**2.** All references hereinafter to Quintiliano are to Joseph Quintiliano.

**3.** This constituted the "double hearsay" referred to in this dissent—Gibbs to Quintiliano and Quintiliano to Bilella and White.

Quintiliano's residence in Pennsylvania to the Gibbs residence or to the Ram Broadcast Company in Massachusetts. There is no evidence, however, of any conversation with Gibbs. The Government suggests that from this series of telephone calls it can be inferred that Gibbs and Quintiliano were discussing arrangements for the sale of the marijuana in furtherance of whatever plans they had made at their April meeting. There are several major problems with the Government's argument, however. One obvious difficulty is the absence of evidence directly linking Gibbs with Ram or proof that any of Quintiliano's calls to Ram were returned. Moreover, except for Quintiliano's out-of-court hearsay, there is nothing to indicate the substance of the conversations or that they actually conversed.

## II.

Although I am inclined to agree with the majority that there may be sufficient evidence to permit a reasonable inference of Gibbs's initial complicity in the enterprise, I strongly believe that the admission of the double hearsay statements constitutes serious and therefore reversible error because it deprived Gibbs of his sixth amendment right to confrontation. Because the independent evidence upon which the Government relied for introduction of the out-of-court statements was so tenuous,[4] it was highly important that any out-of-court statements be unequivocal and that the declarant be subject to searching cross-examination.

In *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), the Supreme Court recognized that the confrontation clause and the hearsay rule "stem from the same roots," but stated that "the Court has never equated the two, and we decline to do so...." *Id.* at 86, 91 S.Ct. at 218. The confrontation clause issue and the evidentiary question therefore must be separately analyzed, and the sixth amendment may require the exclusion of evidence even though admissible under Fed.R.Evid. 801(d)(2)(E). *See United States v. Perez,* 658 F.2d 654, 660 & n. 5 (9th Cir.1981). *See also United States v. Palumbo,* 639 F.2d 123, 131 (3d Cir.) (Adams, J., concurring), *cert. denied,* 454 U.S. 819, 102 S.Ct. 100, 70 L.Ed.2d 90 (1981); *United States v. Puco,* 476 F.2d 1099, 1102 (2d Cir.), *cert. denied,* 414 U.S. 844, 94 S.Ct. 106, 38 L.Ed.2d 82 (1973).

In *Ohio v. Roberts,* 448 U.S. 56, 65–66, 100 S.Ct. 2531, 2538–39, 65 L.Ed.2d 597 (1980), the Supreme Court identified two restrictions that the confrontation clause places on the use of hearsay evidence in criminal trials. First, the prosecution generally must establish that the hearsay evidence is necessary because the declarant is unavailable. Second, the hearsay statement must be reliable. "Reflecting its underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay marked with such trustworthiness that 'there is no material departure from the reason of the general rule.'" *Id.* at 65, 100 S.Ct. at 2538 (quoting *Snyder v. Massachusetts,* 291 U.S. 97, 107, 54 S.Ct. 330, 332–33, 78 L.Ed. 674 (1934)). In the instant case, the necessity aspect of this test has not been met. Therefore, there is

**4.** I do not mean to suggest that there is anything improper in relying on a presumption to show the continuation of a person's participation in a conspiracy, but imposing such a presumption upon slight independent evidence implicating the defendant in the conspiracy only highlights the utter absence of flesh and blood in the Government's case upon which to rest the hearsay statements of a non-testifying conspirator.

The crucial portion of the alleged coconspirator statements was made approximately six months after Gibbs's April 7 meeting in Quakertown. To accomplish the admission, the Government relied upon a presumption that once it established Gibbs's participation in the conspiracy, membership continued thereafter until October 1980 unless Gibbs proved, by affirmative acts inconsistent with the object of the conspiracy, that he had withdrawn. There is no evidence in this record that Gibbs withdrew from the conspiracy after April.

no need to reach the question whether the reliability prong has been satisfied.

Although the literal language of the sixth amendment guarantees to any accused "the right ... to be confronted with the witnesses against him," the Supreme Court has recognized the necessity that extrajudicial statements sometimes must be used because of the declarant's unavailability. Gibbs maintains that Quintiliano was not legally unavailable to testify and that therefore there was no need for introduction of his out-of-court statements. The Government contends that a showing of unavailability is not required.

The Supreme Court discussed the unavailability component of the confrontation clause in *Ohio v. Roberts, supra:*

> [I]n conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case ... the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant.

448 U.S. at 65, 100 S.Ct. at 2538. A witness may be deemed "unavailable" only if the prosecution has made "a *good faith effort* to obtain his presence at trial." *Id.* at 74, 100 S.Ct. at 2543 (emphasis in original) (quoting *Barber v. Page*, 390 U.S. 719, 725, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255 (1968)). And, under the foregoing language in *Ohio v. Roberts*, it is *the prosecution* that must produce or demonstrate the unavailability of the declarants. The Court did not impose any burden on the *accused* to show that the declarant is available.

Quintiliano was a codefendant in the Government's prosecution who had pleaded guilty to two of the three counts in the indictment and was still awaiting sentencing at the time of Gibbs's trial. There is no evidence in the trial record that bears on Quintiliano's availability. Although Quintiliano was faced with an impending sentencing proceeding and might not have been willing to waive his fifth amendment right

and testify against Gibbs, there is a possibility that he would have because he had already pleaded guilty. Because there is nothing in the record to indicate that the Government ever established that Quintiliano would refuse to testify against Gibbs, the Government failed to carry its burden under *Ohio v. Roberts*, 448 U.S. at 74–75, 100 S.Ct. at 2543–44, to demonstrate the declarant's legal unavailability.

In a footnote, the *Roberts* Court suggested that "[a] demonstration of unavailability, however, is not always required," *id.* at 65 n. 7, 100 S.Ct. at 2538 n. 7. To support this proposition, the Court cited *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), in which it had permitted the admission of coconspirator hearsay in circumstances where a seemingly available declarant was not called to testify. The *Roberts* Court described *Dutton* as a case where the requirement of unavailability could be dispensed with because "the utility of trial confrontation" would have been "remote." *See* 448 U.S. at 65 n. 7, 100 S.Ct. at 2538 n. 7; *United States v. Perez*, 658 F.2d at 661. Here, Quintiliano's statements do not fall within the *Dutton* exception to the unavailability requirement because they are crucial to conviction, and not "of peripheral significance at most," as in *Dutton*, 400 U.S. at 87, 91 S.Ct. at 219. Moreover, in *Dutton*, the Court pointed out that the accused there had full opportunity to cross-examine the declarant as to whether he actually heard the person make the statement offered in evidence.

The instant case is also distinguishable from *Dutton* because the Government has not carried its burden of showing that Quintiliano's hearsay statements were "marked with such trustworthiness," *Ohio v. Roberts*, 448 U.S. at 65, 100 S.Ct. at 2538, to justify disregarding the unavailability requirement. I can conceive of possible motives Quintiliano might have had to misrepresent Gibbs's involvement in the crime.[5] For example, Quintiliano may have

---

5. It is true, of course, that Quintiliano's state-   ments were against his penal interest because

misrepresented Gibbs's involvement to reassure his coconspirators that plans for the sale of the contraband were proceeding smoothly. In addition, it is plausible that the statements were contrived as part of Quintiliano's bargaining strategy. Quintiliano may have seen a chance of pressuring the Florida buyers to offer better terms by giving the impression that he had another buyer waiting in the wings. Under these circumstances, the cross-examination of the testifying witnesses (White and Bilella) could not adequately test the truthfulness of Quintiliano's statements.

Most important, I believe that the instant case falls outside the *Dutton* exception to the unavailability requirement because I do not believe Quintiliano's hearsay statements were only "of peripheral significance," *see* 400 U.S. at 87, 91 S.Ct. at 219, in the prosecution's case. The challenged statements provide direct incriminating evidence, in the form of Quintiliano's declaration that Gibbs had agreed to buy the marijuana. Admittedly, there is some other evidence linking Gibbs to the conspiracy. However, unlike *Dutton*, where the disputed evidence consisted of a single sentence reported by one of twenty witnesses, the coconspirator hearsay presented in Gibbs's trial was the core of the Government's case.[6]

The opportunity to cross-examine an accuser or a critical witness is a powerful tool in the search for truth and in the assessment of guilt or innocence. The confrontation clause, in the words of the Supreme Court, contemplates

"a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief."

*Ohio v. Roberts,* 448 U.S. at 63–64, 100 S.Ct. at 2537–38 (quoting *Mattox v. United States,* 156 U.S. 237, 242–43, 15 S.Ct. 337 at 399, 39 L.Ed. 409 (1895)). Because the right of confrontation is so important in our adversarial system, it may only be denied in exceptional situations. The Government has not met its burden to show that the instant case is such an exceptional situation. The prosecution has failed to establish either that the declarant cannot be produced for trial or that the hearsay is sufficiently reliable and insignificant to justify dispensing with a showing of unavailability.

The admission of Quintiliano's statements without giving the defendant the opportunity to cross-examine the declarant sharply tipped the scales of justice against the defendant. The historic safeguard guaranteeing the accused the right to be confronted with the witnesses against him may not be disregarded.

### III.

The majority, however, does not reach the merits of the sixth amendment issue because it asserts that "Gibbs did not pre-

they disclosed his own complicity in the conspiracy. But this fact is hardly conclusive of the statements' reliability, particularly because the critical portions of Quintiliano's statements—his references to Gibbs—were not against his penal interest. *See* Davenport, *The Confrontation Clause and the Co-Conspirator Exception in Criminal Prosecutions: A Functional Analysis,* 85 Harv.L.Rev. 1378, 1395 (1972).

6. The instant case is distinguishable from *United States v. Weber,* 437 F.2d 327, 337–40 (3d Cir. 1970), *cert. denied,* 402 U.S. 932, 91 S.Ct. 1524, 28 L.Ed.2d 867 (1971). In *Weber,* this court upheld against a constitutional attack the use of

a coconspirator's out-of-court statement against the accused. Three factors distinguish *Weber* from the instant case. First, the hearsay evidence in *Weber* presented the "traditional hallmarks of reliability, because they were uttered spontaneously and they were against [the declarant's] penal interest." *Id.* at 340. Here, there are significant doubts about the reliability of Quintiliano's statements. Second, the coconspirator statements in *Weber* were not crucial to the case, as they are here. Third, there was an absolute necessity for admission in *Weber* because the declarant had died before trial.

serve that issue for appeal [and therefore] it cannot serve now as a basis to reverse Gibbs's conviction." Op. at 847. But the issue was raised in the trial court, perhaps not as specifically or as timely as it might have been, but it was raised sufficiently to be preserved and heard.[7]

First, the defendant repeatedly objected during the Government's case in chief to the admission of Quintiliano's statements on the ground that they failed to satisfy Fed.R.Evid. 801(d)(2)(E). Although these objections did not specifically refer to the sixth amendment issue, they should have sufficed to put the trial judge on notice that intertwined with them was a constitutional issue. See State v. Poole, 31 Or. App. 925, 572 P.2d 320 (1977) (objection only on the ground of hearsay was so closely related to the incompetency of the witness as to preserve for appeal the challenge based on the incompetency of the witness). Second, if there was any doubt concerning notice to the Government and the court, it was resolved when the Government rested without calling Quintiliano or producing proof of his unavailability. Only at that point could Gibbs have been certain that he would be denied his constitutional right to confront his accuser. He therefore moved, while the court, jury, and counsel were still present, to strike the hearsay, stating:

> [A]side from the co-conspirator exception to the hearsay rule, there is a clear sixth amendment problem in this case, and the co-conspirator hearsay rule which permits the introduction of co-conspirator hearsay does not subsume and take place of the sixth amendment right to confrontation ... [and] the other cases have recognized that there is still, notwithstanding the existence of 801(d)(2)(E) ...

a sixth amendment right of a defendant to confront and cross-examine his accusers.[8]

(452a–453a) If the Government desired to cure the defect, it could have done so readily at that time. It did not.

The majority asserts that if the defendant had objected when the Government sought to introduce the testimony of White and Bilella that "would have warned the Government of the need to call Quintiliano or to prove his unavailability in other ways." Op. at 849. As a matter of trial management, it would, of course, have been desirable for the defense to have specifically objected at the time on the sixth amendment ground, but not because the Government had to be warned of the need to call Quintiliano or prove his unavailability. The Government should have known that under Ohio v. Roberts, "in the usual case ... the prosecution must either produce, or demonstrate unavailability of, the declarant whose statement it wishes to use against the defendant." See supra at 853. Calling Quintiliano or proving his unavailability was, as the majority recognizes, "a relatively simple matter for the Government." Op. at 848. Taking such action when the motion to strike was tendered may have been an inconvenience for the Government, but an inconvenience so trivial should not be used to nullify an important constitutional safeguard.

Finally, the majority assumes that the district court overruled the defendant's sixth amendment objection on the ground that it was untimely. It therefore declares that "the trial judge's determination of timeliness" can only be reversed for an abuse of discretion. Op. at 850. The record, however, does not support this assumption. The trial judge heard and con-

---

**7.** The majority asserts that the issue was never raised by Gibbs during trial. "Had Gibbs by a specific objection, timely made, alerted the Government and the district court to the fact that no proof of unavailability had been presented by the Government, that deficiency could have been cured." Op. at 847.

**8.** Defense counsel further stated in support of his sixth amendment objection: "The men who

should have been on that witness stand and ... whom I should have been able to cross-examine [were] Joe Quintiliano [and his brother] Jerry Quintiliano, the declarant[s] of the hearsay statement[s], and I have been denied through this case the right to confront and cross-examine ... the ultimate accusers in this case ... Joseph and Jerry Quintiliano." (453a)

sidered the defendant's sixth amendment motion to strike *before* the defense opened its case; he did not reject the motion as "untimely." In fact, he made no ruling at all with respect to this constitutional issue. After hearing arguments of defense counsel and the prosecution when the Government rested, the trial judge either ignored the sixth amendment motion or impliedly equated it with the coconspirator exception. He only ruled: "We find that the Government has established the existence of an alleged conspiracy and the connection of each defendant with it by a clear preponderance of the evidence independent of the hearsay declarations." (480a) This was the substance of the district court's ruling on the defense arguments with respect to the coconspirator statements and the sixth amendment motion to strike the testimony. Thus, as this record stands, the court did not reject the sixth amendment motion on the ground of untimeliness. The prosecution raised no objection to the motion on the ground of untimeliness. The untimeliness question was raised for the first time by Judge Garth *sua sponte* in his dissent from the panel opinion. (Panel slip op. at 30.)

In any event, the confrontation issue is significant to the fact-finding process and to the ultimate determination of guilt or innocence. If the objection was not timely raised, this court may nonetheless take notice of the issue under the plain error rule.[9] The denial of the right to cross-examine the declarant of the hearsay statements, especially under the circumstances we have here, violated a fundamental right of the accused and constituted serious prejudicial error. *United States v. McKinney,* 707 F.2d 381 (9th Cir.1983); *United States v.*

*Provencio,* 554 F.2d 361 (9th Cir.1977); *People v. Marine,* 48 Ill.App.3d 271, 6 Ill. Dec. 25, 362 N.E.2d 454 (1977). "In exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice error to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Silber v. United States,* 370 U.S. 717, 718, 82 S.Ct. 1287, 1288, 8 L.Ed.2d 798 (1962) (per curiam) (quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)).

Courts have found no difficulty in reviewing a sixth amendment issue under the plain error rule for the waiver of fundamental constitutional rights "is not lightly to be found." *United States v. Provencio,* 554 F.2d at 363. In *United States v. McKinney,* 707 F.2d 381 (9th Cir.1983), the defendant, as in this case, was convicted on Government testimony that constituted double hearsay. Although the sixth amendment issue was neither raised in the district court nor briefed or argued on appeal, the circuit court *sua sponte* considered the issue under the plain error rule and reversed. In *United States v. Provencio,* the court held that the introduction of depositions without any proof that the deposed witnesses were unavailable was such an obvious violation of the accused's rights to confrontation that "it is unnecessary for us to decide whether the error in admitting the evidence without objection was plain error." 554 F.2d at 362. The court refused to infer a waiver of a fundamental right from the failure of the defense counsel to object at the time of trial. *Id.* at 363.[10]

---

**9.** Fed.R.Crim.P. 52(b) provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Plain error has been defined as "serious and manifest" or "seriously prejudicial error" or "grave errors which seriously affect substantial rights of the accused." *United States v. Morales,* 477 F.2d 1309, 1315 n. 17 (5th Cir.1973). *See United States v. Nobel,* 696 F.2d 231, 237 (3d Cir.1982).

**10.** Other federal courts that have on appeal reviewed a confrontation argument, although the issue was not specifically raised at trial, include: *United States v. Escobar,* 674 F.2d 469 (5th Cir. 1982) (admission of officer's testimony constituted plain error affecting substantial rights that court will review even absent timely objection at trial); *Naples v. United States,* 344 F.2d 508 (D.C.Cir.1964) (reception of double hearsay reviewed as plain error although not raised below); *United States v. Dunn,* 299 F.2d 548 (6th Cir.1962) (receipt of inadmissible hearsay that

In *People v. Marine*, 48 Ill.App.3d 271, 6 Ill.Dec. 25, 362 N.E.2d 454 (1977), the appellate court reviewed a confrontation issue although the defendant had objected at trial only on the ground of hearsay. In rejecting the state's argument that the defendant had waived the confrontation issue by only objecting on the ground of inadmissible hearsay, the court stated: "Even if we were to find a waiver of this issue for purposes of appeal, we regard the right to confrontation to be of such significance as to involve the application of the plain error rule." *Id.* at 276, 6 Ill.Dec. at 29, 362 N.E.2d at 458 (citations omitted).

## IV.

In summary, I believe that the sixth amendment issue was timely raised, even if the objection came at the close of the Government's case. Had it not been timely, this court should review the issue under the plain error rule both because fundamental rights are involved and because the Government's case rests largely on untested, devastating hearsay. Because the defendant has been denied the right of confrontation and cross-examination, "an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal," *Barber v. Page*, 390 U.S. 719, 721, 88 S.Ct. 1318, 1320, 20 L.Ed.2d 255 (1967) (quoting *Pointer v. Texas*, 380 U.S. 400, 405, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965), the judgment of

conviction should be reversed and the case remanded for a new trial.

SEITZ, Chief Judge, dissenting.

I am in agreement with all the basic conclusions reached in Judge Rosenn's dissent.[1] I write separately because Judge Rosenn would order a new trial while I would vacate and remand to afford the government an opportunity to discharge its burden of showing that Quintiliano was unavailable at the time of the trial. *See* 28 U.S.C. § 2106.

The only issue dividing the court concerns a possible violation of the Confrontation Clause. I agree with Judge Rosenn that there was a violation of the Confrontation Clause if Quintiliano was available at the time of the trial. On the other hand, if the government can present clear and convincing evidence at a hearing that it made a "good faith effort" to obtain Quintiliano's presence at trial, *see Ohio v. Roberts*, 448 U.S. 56, 74, 100 S.Ct. 2531, 2543, 65 L.Ed.2d 597 (1980), or that such an effort would have been clearly unavailing, then I believe the government will have satisfied the unavailability requirement of the Confrontation Clause.[2] This would correct the erroneous ruling of the district judge at the trial. I can think of no legitimate societal purpose to be served by ordering a new trial, unless such a hearing would debase the values inherent in the Confrontation Clause.

---

was the only evidence sufficient to make prosecution's case reviewed by appellate court on its own motion).

In this court, we have often applied the plain error rule, sometimes in cases that did not even involve fundamental rights of the accused. *See, e.g., United States v. Logan*, 717 F.2d 84 (3d Cir.1983) (failure to preserve issue of trial court's failure to instruct on character witness reviewable as plain error); *Government of the Virgin Islands v. Joseph*, 685 F.2d 857 (3d Cir. 1982) (submission to jury of defendant's confession and minister's letter when not admitted of record reviewable as plain error); *Government of the Virgin Islands v. Brown*, 685 F.2d 834, 839 (3d Cir.1982) ("[t]he omission of an essential element of an offense in the charge to the jury ordinarily constitutes plain error, even in the

absence of objection"); *United States v. DiPasquale*, 677 F.2d 355, 359 n. 10 (3d Cir.1982) (submission of case to jury despite failure to renew motion for judgment of acquittal at close of all the evidence reviewable under plain error rule); *Beardshall v. Minuteman Press Int'l, Inc.*, 664 F.2d 23 (3d Cir.1981) (erroneous instruction on burden of proof in civil case reviewable under plain error rule despite counsel's failure to object).

1. I do not find it necessary to join Judge Rosenn's plain error discussion.

2. It would be for the district court to consider the "trustworthiness" issue if it determined that Quintiliano was unavailable.

I assume that the objection to a later hearing on the unavailability issue would be based on the problems inherent in reconstructing the situation that existed at the time of the trial. It seems to me that the heavy burden on the government at such a hearing, together with the requirement that the district court make a reasoned determination, subject to appellate review, provides meaningful assurance that a defendant will not be impermissibly deprived of his Confrontation rights.

I recognize the concern expressed by the then Chief Judge Bazelon in his dissent in *Henderson v. United States*, 349 F.2d 712 (D.C.Cir.1965), that a remand places what amounts to a psychological burden on the defendant because of the court's awareness of the conviction. However, I believe the safeguards afforded, including appellate review, sufficiently protect a defendant's Confrontation rights. Indeed, the nunc pro tunc hearing approach to the suppression of evidence which was approved in *Waller v. Georgia*, 52 U.S.L.W. 4618, 4620–21 (May 22, 1984) and *Jackson v. Denno*, 378 U.S. 368, 394, 84 S.Ct. 1774, 1790, 12 L.Ed.2d 908 (1964), certainly implicated defense interests every bit as important as that here implicated. *Compare Government of the Virgin Islands v. Smith*, 615 F.2d 964 (3rd Cir.1980).

Thus, while I join the basic conclusions in Judge Rosenn's dissent, I would vacate and remand for an evidentiary hearing on the unavailability issue and, if pertinent, the trustworthiness issue.

I therefore dissent.